# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CIVIL DIVISION

RECEIVED
MAR - 1 2006
NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

|  |  |
|---|---|
| DAVID MEAD<br>8204 Moorland Lane<br>Bethesda, Maryland, 20817<br><br>                              Plaintiff,<br>Vs.<br><br>Sue Ann Mahaffey, et al.<br><br>                              Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case Number 05CV02316

(EGS)

## MEMORANDUM TO DEFENDANTS OPPOSITION TO PLAINTIFFS' MOTION FOR LEAVE TO AMEND

Comes now the Plaintiff, DAVID MEAD, Pro Se, and pursuant to LCvR 7 (a) (b) (c) and Rules 7 (b) and 11 (a) (b) of the Federal Rules of Civil Procedure, files this Memorandum to the Opposition to Motion for Leave to Amend and states as follows:

1.      If the Amended Complaint was not included with the other pleadings, to the defendant, then a sincere apology is in order. It should be noted, however, that the only change in the amended complaint was adding Jenise McRae as plaintiff, and defendant was aware of that change in a letter to defendant on January 19, 2006 in which defendant chose not to respond (see plaintiffs letter attached as Exhibit "A").

2.      Plaintiff Jenise McRae's family is correctly identified in the original and amended complaint as a victim of several 42 U.S.C. violations. The Affidavits of Denise McRae and Nattonia Ross (Exhibits "D" and "E" in the original complaint) speak for themselves as to the nature and extent of the 42 U.S.C. violations (see both Affidavits attached again herein as Exhibits "B" and "C").

3.    Both the original and amended complaint contain an abundance of factual references to violations of 42 U.S.C., not specifically to Jenise McRae, but to the McRae and Ross families, as evidenced in the attached Affidavits, and more fully set forth in the original and amended complaints.

Defendants' comments that "there is no resemblance between the signature on the affidavit of Denise McRae and the signature of Jenise McRae" is of no moment. Plaintiff Jenise McRae is the daughter of affiant Denise McRae, so the signatures are of course different. Denise McRae prematurely passed away in July 2005 from an unidentified stress-related heart failure. The McRae family, including Jenise McRae, have lived in their present apartment since April 19, 2001 (see lease identifying occupants attached as Exhibit "D"), and Jenise McRae is a first-hand victim to the 42 U.S.C. violations of co-defendant, Shahram Roudi, which are clearly spelled out in the Denise McRae and Nattonia Ross family Affidavits.

4.    Plaintiff Jenise McRae has been victimized by the factual violations of 42 U.S.C., as set forth in both the Affidavits, and in Counts Three and Four of the original and amended complaints.  It is misleading for defendant to suggest in paragraph 4. that Counts Three and Four were added to the amended complaint when they were clearly in the original complaint (see pages 28-32) along with Counts 1, 2 and 5.

In the defendants' WHEREFORE, it again appears that defendants would have the Court believe that Counts' Three and Four were added to the Amended complaint, when they were in fact in the original complaint as indicated above.

WHEREFORE, in accordance with Rule 15 (c) (2) of the Federal Rules of Civil Procedure in the interest of justice, plaintiff respectfully requests the Court to

approve the Amended complaint adding Plaintiff Jenise McRae, as the claim in the

amended complaint arose out of the conduct specifically set forth in the original

complaint.

Respectfully submitted,

David Mead
P.O. Box 30006 Bethesda, Md. 20824
(8204 Moorland Lane, Bethesda, Md.)
301/ 656. 2516 (o) 301/656.1593 (f)

## CERTIFICATE OF SERVICE
## MEMORANDUM TO OPPOSITION OF MOTION TO AMEND

I hereby certify that on the March 2, 2006, I mailed a true copy of the foregoing first class, postage pre-paid to the following persons:

Sue Ann Mahaffey
Stein, Sperling and Bennett, Etc
25 West Middle Lane
Rockville, Maryland, 20850

S. Ricardo Narvais
1300 Spring Street #500
Silver Spring, Md. 20910
Lawyer for Shahram Roudi

Chao W. Chen
258 B. Market Street East
Gaithersburg, Maryland 20878

Weichert Realtors, Inc.
225 Littleton Road,
Morris Plains, New Jersey, 07950

Kathleen Sheeran, Agent
Weichert Realtors
6610 Rockledge Drive, Suite 100
Bethesda, Maryland 20814

Nasser Shahparast,
Royal Investment Group LLC
5301 Goldsboro Road
Bethesda, Md., 20817

Royal Investment Group LLC
a/k/a Foreclosure Real Estate
13799 Park Boulevard N. # 258
Seminole, Florida, 33776

Timothy (Ken) Crowley, Remax Realtors
6 Montgomery Village Avenue #200
Gaithersburg, Maryland 20879

Kathleen Tiong, Agent Remax Realtors
6 Montgomery Village Avenue, # 200
Gaithersburg, Maryland 20879

Alan Frankle
751 Rockville Pike #7
Rockville, Md. 20852
Lawyer for Yona Mead

Jenise McRae
1814 North Capitol St., N.W. #3
Washington, D.C. 20001

Parcorp Services, Ltd, Inc.
3108 South Route 59 #124-363
Naperville, Illinois 60564

DAVID MEAD

# EXHIBIT A

# David Mead
## 8204 Moorland Lane, Bethesda, Md. 20817
## P.O. Box 30006, Bethesda, Md. 20824
## 301. 656. 2516 (o) 301.656.1593 (f)david.mead@comcast.net

---

### VIA FACSIMILE 301.838.3250

### PERSONAL AND CONFIDENTIAL FOR NEGOTIATION PURPOSES

January 19, 2006

Ms. S.A. Mahaffey
Stein, Sperling, Bennett, etc.
25 West Middle Lane
Rockville, Maryland 20850

> Re:    Federal District Court # 1:05CV02316
>        Circuit Court # FL13261

Dear Ms. Mahaffey:

I am writing this letter in response to your emails dated January 5th and 10th, 2006. I will begin by attempting to dispense with a few contemporaneous issues and then I will proceed to address the longer-term issues from a global perspective.

Furniture. There are several issues on this point. First, the reference to the "remaining" furniture causes me great distress. Obviously, there has been major theft of personal belongings from my home since the time that you and Weichert took control, as evidenced by the thefts that you reported to the Bethesda Police, and my subsequent conversations with them. I don't know how much of my personal belongings remain, but I will need access to my home at some point to take pictures of the interior in order to compare them with the photographs that were taken when my daughter and I both vacated the home. Second, it's not necessary, nor is it advisable for you to remove any of my personal belongings from the home because I fully expect to prevail in the Federal District Court action and I will eventually be re-taking possession of the property. Third, there is a Lis Pendens that I filed on the property several months ago which will be updated very soon to reflect the pending complaint in the Federal District Court. Almost needless to say, it would be highly improper for you to attempt another transfer at this time. Fourth, if I should learn that either you or Weichert are attempting to again transfer the property during the litigation, I will not hesitate to take swift action at both the Circuit Court and federal court levels to prevent such an

occurrence. I would prefer that it does not come to that, but your actions will determine whether that will be necessary.

Repairs. I am concerned about your reference to "repairs". When the home was first marketed by Weichert in June, 2004, it was to be sold in an "as is" condition. Does your reference to making the repairs mean that you have been planning to do additional improvements to market the home, or has there been damage done to the home during the time that it has been vacant for the last 18 months? If there has been damage, has it been reported to the insurance company as it should have been? I would appreciate you letting me know the status of these questions.

With regard to the longer-term perspective, I am in receipt of your email comments about your desire to see the case dismissed, and I take your comments as a suggestion for a possible, early, out of court settlement. Perhaps I am correct in this assumption. As you may know, federal law suits are very expensive propositions. When you add in a jury trial as in this case, it's not just expensive, but the outcome is highly uncertain, even under the best of defensive postures, particularly with the weight of the substantive facts and the nature of the complaint. In regard to litigation expenses, I will soon be filing a Witness List in accordance with the federal rules. At the present time, I have identified 36 witnesses that I will call, including Judges' Ann Harrington and James Ryan of your Circuit Court, and the Honorable Judge Paul Mannis of the Federal District Court in Maryland. Requests for admissions will soon follow after that. If there is a time to talk about an early court settlement, I would imagine the time is now. The further into the litigation that we go, the less likely of a negotiated settlement.

Regarding my own short and longer-term view of the case, it is at balance: on the one-hand, I am deeply motivated to see this case through to trial, given the longevity of all the facts, the wrong-doing, and above all else, to achieve a just resolution in a fair and unbiased legal forum. Much has been lost during this time at my personal expense. And much personal harm has been visited upon my daughter and others. On the other hand, I have no particular axe to grind, and for wisdoms' sake, with all other things being equal, it would be better to resolve the matter sooner rather than later. Either way though, it is justice now, or justice later, but justice will be done for the plaintiff(s). That's how I see it.

There are ten defendants in this case, excluding the "Royal Investment Group". Although you do not represent or speak for the other defendants, my assumption is that given the breadth, the substance and the potential consequences of this action on the co-defendants, they may not want to see this case through to a trial either. I should mention at this point that within the next 30 days, I will be filing a motion to Amend the Complaint, by adding additional plaintiffs to round out the complaint, and by possibly adding additional torts at that time as well.

In terms of the substance of a potential out of court settlement, I have estimated that when it is all said and done that I will have incurred about $500,000 in actual

damages, which includes the wholesale losses incurred during the tenured sale of the District of Columbia properties, the carrying costs of the Moorland Lane property, rental payments made by the plaintiff during this time, the legal expenses, etc. Naturally, this estimate does not include the still undetermined emotional harm that has been inflicted on my daughter and others, or the civil rights abuses that are identified in the complaint. With so many defendants in this case, that burden, however weighed or shifted among individual defendants, may be feasible for the co-defendants given the other alternatives.

As mentioned, I expect to amend the Complaint within the next 30 days. At that point, with separate lawyers representing the additional plaintiffs, I will have lost the ability to resolve the entire complaint on my own devices. In that regard, if you and the other defendants are interested in an early out of court settlement as it appears to me that you are, I would be willing to consider such an arrangement. If that is so, then it would be advisable for you to discuss this matter with your co-defendants and let me know your joint or separate positions on the matter as soon as possible.

Sincerely,

David Mead

# EXHIBIT B

# AFFIDAVIT OF DENISE MCRAE

The following statement of facts are made of my own free will, with the sole intention to speak the truth and with no pressure or incentive to state the facts otherwise.

I, Denise McRae, being first duly sworn upon oath, depose and state as follows:

1.      I am over eighteen years of age, have personal knowledge of the facts contained herein, and am competent to testify.

2.      I am a tenant of a property located at 1812-14 North Capitol Street, N.W., Apt. # 3, Washington, D.C. 20002.

3.      In mid-September 2002, Mr. Shahram Roudi arrived at our building and announced that he represented the "new owners" of the building. His unexpected visit and his loud and aggressive manner caused fear and apprehension for myself and other residents of the building.

4.      From mid-September through mid-November, Mr. Roudi and his associates made several visits to the property, knocking on tenant doors during all times of the day and night, without any prior notice, demanding entry into our apartments to "inspect the premises". He always did this in a very intimidating manner.

5.      On one occasion, I told Mr. Roudi that we as tenants intended to exercise our right to purchase the building. He responded: "You have an awful lot to say Ms. McRae". "Maybe if you don't like living here you can leave". He talked as though I was inferior to him. It was insulting and demaning to me.

6.      On another occasion in late-September 2002, one of Mr. Roudis' associates stood outside the building and told several of us that the "new owners" intended to pay tenants $3,000-$5,000 apiece to move out so they could rehabilitate the building and re-sell the units as condominiums to middle-income residents ($125,000 – $150,00).

7.      On two separate occasions, we heard Mr. Roudi telling his associates to "jack up" the price of their bid proposals. The first time was in late-September, 2002 with a consulting engineer. Mr. Roudi told the engineer to inflate the cost estimate to so he could "cram down" the purchase price for the "new owners". Apparently, the "new owners" made an offer higher than what they were willing to pay.

8.    On the second occasion in early October, 2002, we heard Mr. Roudi tell another contractor, Master Builder Inspection, Inc. to inflate the price so that the Trustee selling the building could withdraw money from an escrow account to make improvements to the property prior to settlement. I understand the estimate was for $35,000. By comparison, the lowest bid from Bey's Home Improvements was for $2,800. The work was completed by the second highest bid was $6,000, one-sixth of the inflated price.

9.    Whenever we talked to Mr. Roudi of our intention to purchase the building, he invoked his close relationship with the Trustee, Ms. S.A. Mahaffey and said it wouldn't happen. They did this to discourage us and to delay our purchase of the building.

10.    Since that time we have duly organized as a tenant association, Affordable Housing Choices, LLC and expect a fully ratified contract from the Trustee, S.A. Mahaffey in the next few days, despite Mr. Roudis' intimidating tactics.

11.    We believe Mr. Roudis motive all along was to simply to get his 5% commission, however, both Mr. Roudi and the Trustee, S.A. Mahaffey's attitude and actions always seemed to have racial overtones as well.

12.    Since the Trustee S.A. Mahaffey took control of our building in April 2002, maintenance ceased except for government imposed infractions, and conditions have become indecent, unsafe and unsanitary. It is demeaning to live in these conditions.

12.    We understand from talking with officials at the Department of Housing and Community Development and Consumer and Regulatory Affairs that several violations of law have occurred by Mr. Roudis' actions, specifically frequent and unannounced visits over a two month period of time beyond any reasonable inspection period.

13.    I have re-read the attached documents dated 12/27/02, 4/9/03 and 6/2/03. and they are absolutely truthful representations (see attached).

I DO SOLEMNLY DECLARE AND AFFIRM UNDER THE PENALTIES OF PERJURY THE CONTENTS OF THE FOREGOING DOCUMENT AND ATTACHMENTS ARE CORRECT AND TRUE AND BASED UPON PERSONAL KNOWLEDGE.

Denise McRae, President
Affordable Housing Choices, LLC.

Subscribed and sworn to me this ____ day of _August_, 2003

Notary Public
My commission expires 09-14-07

# EXHIBIT C

# AFFIDAVIT OF NATTONNIA ROSS

**The following statement of facts are made of my own free will, with the sole intention to speak the truth, and with no pressure or incentive to state the facts otherwise.**

I, Nattonnia Ross, do hereby state the following:

## SPECIFIC FACTS:

I am an African-American woman and mother of six children whose ages are 15, 10, 9, 5 and two 3-year-old twins.

I moved into 5004 Brooks St., N.E., Washington, D.C. on June 1, 2001.

The lease term at 5004 Brooks Street, N.E., was in effect through June 2003. I had planned to renew the lease with the longer term objective of buying the house through the District of Columbia housing assistance programs.

On about the middle of November 2002, Mr. Ron Roudi, also known as Shahram Roudi, unexpectedly came to my home. He advised me that he was hired by Ms. Sue Mahaffey, Trustee, to sell the house. I told him to talk to David Mead, the man who owned and rented me the house. He said he didn't have to talk to anyone and that David Mead was no longer the owner.

On about the end of November 2002, Mr. Roudi came to my home again and installed a "For Sale" sign in the front yard. He asked to make my home available to show to potential buyers. I agreed to do that as long as he called my mother to give _24 hours advance notice._ He agreed to do that.

A few days later, Mr. Roudi called my mother as agreed and brought a white male by my home the following day. This was the first and _only_ time he gave advance notice. He came _7 other times_ after that **without giving any advance notice whatsoever.**

On two separate occasions, he came to my home when my sister Georgia was baby-sitting my children. The first time he came alone and said that he was there " just checking things out".  Georgia refused to let him in the house

because I was not at home and she was not expecting him. Mr. Roudi became very angry and had heated words with Georgia as a result.

Around the Christmas/New Year's holidays, Mr. Roudi showed up twice more with a 28-30 year old white female who he described as the "new owners". I was told they had bought the house and were going to do major renovations while my family still lived there. This troubled me a lot. The second time they came by, they said they couldn't do the renovations while we lived there so we'd have to move out before the renovations got started. Mr. Roudi pressured me to find another place to stay during the renovations. I was feeling a lot of anxiety and fear. I had no place for my family to go.

Around the early part of January 2003, Mr. Roudi came by again with "First Right of Refusal" papers. He asked me if I was interested in buying the house. I told him I wanted to buy it but didn't have the money at the time. Then he said I couldn't afford to buy it and asked me to sign the papers so he could turn them into the Section 8 office. I didn't know what to do. I felt a lot of pressure and was upset about the whole matter. Eventually, I signed the papers.

A few days later, Mr. Roudi came by again with another white male. By this time, I was completely frightened and refused to let him in. He started pounding very hard on the front door and was shouting, demanding that I open the door. He was there for about 20 to 30 minutes, walking around the outside of the house, banging on the front and back doors and shouting. He tried to get in from the side and cellar entrances but the doors were locked.

The second time he came when my sister Georgia was baby sitting, she was in the bathroom upstairs when Mr. Roudi arrived with a white male. The children opened the door for them. They walked in and went through the entire house. They went upstairs and walked into the bathroom while Georgia was unclothed and getting out of the bathtub. This was extremely distressing to her. Mr. Roudi and the white male acted undeterred. He said that he had received a down payment and that the house had been sold. He told my sister that we didn't belong there anymore and had to move. He also said the utilities were going to get cut off. Terribly frightened of that prospect, we called and left two or three messages to Ms. Mahaffey but she didn't return the calls.

All this experience left me very frightened for my family. Mr. Roudi deliberately misled us into believing that the house was sold and we had to move out, even though the lease term was effective to June 2003. Under a lot of pressure and afraid for the well-being of my children, I moved out in haste on January 25, 2003, leaving many of my personal belongs behind, including my daughters bed and children's' clothing. Before moving, I told Mr. Roudi I had no money to move. He told me to call Ms. Mahaffey and get some money from her.

Throughout this whole ordeal, both my mother and I left messages with Ms. Mahaffey but she never returned the calls.

A few days after I moved out, I returned to get more of my belongings. I noticed that the back door had been kicked in. Also, the new washer and dryer were no longer in the basement. I called Mr. Roudi around January 27 and asked if he had been to the house. He sounded suspicious and kept asking, "why do you want to know"? When I told him that the washer and dryer were missing, that's when he said he had not been to the house.

One of the main reasons that I leased this house from Mr. Mead was that he promised to assist me in buying the house through government sponsored home-ownership programs. I was very excited about that possibility. Now the house is boarded up and my home ownership opportunity has evaporated. This should never have happened under any circumstance.

All the time that I knew Mr. Roudi, I found him to be a very intimidating person. He is also dishonest. He stated that the house was "sold" when it was not. He used unscrupulous tactics and threatened my family that caused me to move out _five months before my lease expired_ under extreme circumstances. Apparently, he did this so he could earn a real estate commission that he would have otherwise not earned had I stayed and purchased the house as originally intended. I believe Mr. Roudi should be punished for his unscrupulous actions and for the pain and humiliation that he has caused for my family and me.

Nattonnia Ross

Subscribed and sworn to me this 11th day of June, 2003

JESSICA MARIA RODRIGUEZ
Notary Public, State of Maryland
My Commission Expires Aug. 23, 2005

Notary Public

# EXHIBIT D

## LEASE AGREEMENT

THIS LEASE is made on the 19th day of April, 2001 between Washington Management Group

hereafter referred to as Landlord, and Ms. Denise McRae and family hereafter referred to as Tenant.

1.    ADDRESS OF PROPERTY, TERM AND RENT.

In consideration of the premises, rent and covenants herein expressed, Landlord hereby leases to tenant, upon the terms and conditions herein set forth certain premises and property known as 1814 North Capitol Street, N.W., Apartment #3, Washington, D.C. 20001 for a term commencing on the 19th day of April 2001, and ending on the 30th day of April, 2002, for an annual sum of Ten Thousand Eighty Dollars and 00/cents ($10,080.) payable in monthly installments of Eight Hundred and Forty Dollars ($840) in advance on the first day of each calendar month during the term hereof without notice or demand or deduction. If the term of the lease begins on a day other than the first day of a calendar month, the parties agree the rent shall be prorated, and rent for the remaining twelve months shall be due on the first of the month as provided above. That portion of the rent payable by the tenant, until further notice, shall be made payable to the following:

### Washington Management Group
### P.O. Box 30006
### Washington, D.C. 20824
### 301.656.2516

Tenant shall pay make rental payments in certified check or Money Order as determined by Landlord. A Service Charge of 10% of monthly rent will be automatically made for each instance in which a check is returned unpaid by the Tenants' bank for any reason. A Late Charge of 10% of monthly rent shall be assessed for payments not received five (5) days after the due date on any given month. In addition, tenant agrees to pay any and all costs for maintenance of the premises and the common areas. All maintenance costs, damages, attorney fees, expenses, charges and sums together with interest and penalties under this lease shall be deemed to be collectable as Additional Rent under this lease.

Provided always, that if the Tenant shall fail to pay the rent in advance on the first day of each month, or violate any covenant, condition or terms within this lease, this agreement and all things herein contained in this lease shall at the option of the Landlord cease and terminate, and the Landlord may proceed to recover possession of the premises by legal process.

2.    ACCEPTANCE OF PREMISES

The tenant has examined and accepted the premises in an "as is" condition. Acceptance of this agreement is conclusive evidence that said premises are in good and satisfactory condition and repair unless otherwise specified herein. Tenant agrees that no representations have been made as to the condition of the premises and that no agreement has been made to redecorate, repair or improve the premises unless set forth specifically in writing. Landlord has delivered the leased premises in a clean, safe and sanitary condition.

3.    USE

Tenant will use said premises and property as a single family residence for no more than 4 persons. The occupants are:

| NAME | DOB | SOCIAL SECURITY | RELATIONSHIP |
|------|-----|-----------------|--------------|
| Denise McRae | 2/13/60 | 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 | Mother/Head of Household |
| Jenise McRae | 6/24/75 | 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 | Daughter |
| Derrell Goins | 9/29/87 | | Son |
| Joseph McRae | 7/26/88 | | Son |

No other person may live, occupy or visit overnight without the prior written consent of Landlord. Landlord shall have the absolute right to exclude from the premises and property all persons other than those identified in this lease who are deemed adverse to the health, safety and well-being of other tenants or to the reputation of the property, in Landlords' sole discretion. Any breach of this provision shall be cause for immediate lease termination. Tenant shall not do nor permit anything to be done in or about the premises that has an unlawful or objectionable purpose, or that causes injury, damage, inconvenience, annoyance or discomfort of any kind to the rights and privileges of other residents of the property. Nor shall tenant act in any manner that is offensive, or that endangers the safety and well-being of other residents as determined in Landlords' sole discretion. Tenants shall take a pro-active stance in contributing to the safety and well-being of all residents of the property by keeping the front entrance door locked and secured at all times; by keeping the front entrance to the building clear and free of all persons, whether said persons are tenants, guests or trespassers on the property. **If Tenant shall notice any person(s) using the front entrance or common areas of the building for any purpose other than entering or exiting, Tenant shall immediately call the 5th District Police at (202) 7274510** to report the building security breach. Calling the police in such circumstances is an absolute obligation of tenancy. Tenant shall not use the front entrance or common areas of the building for any reason except to enter and exit the premises, and Tenant shall never permit others to congregate or loiter in common entrances, hallways and stairwells.

4.      POSSESSION

If, on the commencement date of the lease, for any reason the landlord is unable to deliver possession of the premises, Tenants' right of possession hereunder shall be postponed until the premises are ready for occupancy, and rent due hereunder shall be abated at the rate of one-thirtieth of a monthly installment for each day that possession is postponed.

5.      UTILITIES:            **ALL UTILITIES INCLUDED**

Tenant is obligated to pay the following utilities: GAS____ ELECTRICITY____ PRORATED HEAT____ PRORATED WATER____ Tenant shall make all the necessary deposits in connection therewith and pay all bills for the aforesaid utilities. Tenant shall use reasonable care in conservation of all utilities, and will fully cooperate with Landlord in any and all energy conservation efforts, including but not limited to window coverings, especially in heating season, flow restrictors for water conservation. Tenant shall not bring into use any articles in the demised premises that will overtax the floor load capacity, or overtax the gas, electric or water utilities by installation of any appliance(s) other than that provided by Landlord.

6.      INSURANCE

Tenant will do nothing or permit anything to be done on the premises which contravenes any insurance policy covering the same. All goods and personal property of every kind in the premises shall be there at the sole risk of Tenant. Tenant shall be responsible for providing insurance for all personal property in or about the premises.

7.      ALTERATIONS

Tenant shall not remodel, make structural changes, alterations or additions to the premises, and shall not paper, paint or decorate, install, attach, remove or exchange appliances or equipment, such as air conditioning, heating, refrigerating or cooking units, cable or television antennae, nor drive nails or other devices into walls or woodwork, nor change the existing locks of the premises, without the prior written permission of the Landlord. If permission is granted by Landlord for tenant to install additional locks, Tenant will immediately provide Landlord with an original key to said lock(s).

8.      REPAIRS AND MAINTENANCE

Tenant shall be responsible for the repair, maintenance and cleanliness of the premises and common areas including fixtures and equipment contained within the premises, and shall promptly repair and maintain the following:

2

a)    Proper maintenance and repair of all appliances, including but not limited to stove, refrigerator, fans, disposals, light fixtures and all electrical, mechanical and plumbing devises;

b)    stoppage or slow drainage of all tubs, toilets, sinks and drains caused from any reason whatsoever.

c)    All waste and trash disposal must be placed in suitable containers within the premises and properly disposed of daily in the dumpster provided in the rear of the building. Trash or waste of any kind must never be stored on the back porches or any common area other than the dumpster provided and must not be thrown into the dumpster from any distance. It is the obligation of the tenant to keep the rear yard area clean and free of trash of any kind.

d)    Repair and maintain all caulking around tubs and showers and all leaks therefrom.

e)    Any repairs made necessary by the acts of the Tenant, guests or invitees shall be paid for by the tenant. Tenant shall not order repairs on or about the premises without prior written approval of the landlord. Inasmuch as the Landlord desires to keep the property in good repair, Tenant agrees to notify Landlord in writing by Certified Mail of any repair requests, and must specify in the provision of access to the premises, indicating the time and date that access can be had. Failure to notify Landlord in writing will constitute a violation of this lease agreement.

Landlord shall be under no obligation to make repairs, alterations or improvements to or upon the Leased premises or any part thereof, at any time except as otherwise provided in this Lease.

9.    SUBLETS AND ASSIGNMENT

Tenant shall not assign this lease or sublet the premises or any portion thereof, or transfer possession or occupancy to any other person or persons, or permit any other person or persons to stay overnight in the premises, whomever they may be, for any reason, without the express written consent of the Landlord.

10.    PETS

Tenant shall not keep any pets on the premises without express written permission of the Landlord.

11.    RELOCATION

Landlord shall have the right, upon not less than sixty days' written notice to Tenant, to change the location of the premises to another location within the building for any reason deemed reasonable by Landlord. If Tenant is occupying the Premises when Landlord exercises its rights hereunder, Landlord, at its expense, shall remove, relocate Tenant's furniture to the new premises. On completion of the change in location of the premises, the parties shall execute an amendment to this lease which sets forth the new description of the premises. Should Tenant refuse to permit Landlord to move Tenant to such new location at the end of said sixty day period, Landlord shall have the right to terminate this lease, effective thirty days from the date of Landlord's original notice to Tenant.

12.    SURRENDER

Tenant will upon termination of this lease, surrender the premises and all fixtures and equipment of the Landlord therein in good, clean and operating condition, ordinary wear and tear excepted. Tenant shall at the time of vacating the premises clean the premises including stove and refrigerator, and remove all trash from the premises. If such cleaning and removal of the trash is not accomplished by the tenant, action deemed necessary by the Landlord to accomplish the same shall be taken by Landlord at tenant's expense. Upon vacating the premises, Tenant shall deliver all keys to the Landlord within twenty-four hours of vacating the premises.

13.    INSPECTION

Landlord may enter the premises during reasonable hours to examine or to make necessary repairs, and to protect any property from damage. During the last sixty days of the term of the lease or any extensions, Landlord may enter the premises to exhibit the same to other persons and to place a "for rent" or "for sale" sign thereon.

14.    DESTRUCTION

If the premises are rendered unfit for occupancy by fire, acts of god or accident, the term of this lease shall immediately cease upon the payment of rent apportioned to the day of such happening. If however, the premises are only partially destroyed or damaged and Landlord decides to repair the same, such repairs will be made by landlord within reasonable time, and this lease shall remain in full force and effect without any abatement of rent.

15.    LEASE EXPIRATION/TERMINATION

Tenant must give ninety (90) days written notification of intent to vacate the premises. If notice to vacate is not given by Tenant, the lease automatically terminates. After the expiration of the initial term of this agreement, if tenant remains in the premises after giving notice to vacate, the tenancy shall be deemed a tenant at sufferance, and the tenant hereby agrees to pay 110% of the monthly rental thereafter or any increased monthly rental for which the Landlord has provided notice to Tenant not less than thirty days in advance of the first day of the month. Tenant shall keep and fulfill the conditions covenants and terms of this agreement throughout the tenancy at sufferance. In so doing, the Landlord reserves the right to re-negotiate new terms and conditions at any time, and to require the tenant to enter into a new lease agreement for a term not greater than the term of this agreement. Refusal to do so by the Tenant shall constitute a default of this lease.

16.    CREDIT CLAUSE

Tenant has authorized Landlord to order a Consumer Report (credit report) from a consumer reporting agency to be used in connection with the execution of this lease. Tenant hereby authorizes the Landlord to disclose to any other party the credit information provided to the Landlord by such consumer reporting agency or by the tenant.

17.    **HOLD HARMLESS**

**Landlord and his agents shall be held free and harmless from any and all losses, claims or damages for any reason to any person or property occurring on or about leased premises during the term now and for all time. All personal property within the premises remains at the sole risk of the Tenant.**

18.    DEFAULT

If Tenant fails to pay the rent as scheduled, or violate any other conditions of this lease, than the lease may be terminated at the option of the Landlord In such cases, this lease will operate as a NOTICE TO QUIT. Any notice to quit as required by law is hereby expressly waived. Upon default, Landlord may proceed to recover possession of the premises without a demand for rent or possession under provisions of the District of Columbia Code which regulate proceedings between land lord and Tenant. In the event of any such default, Tenant hereby confesses judgment jointly and severally for the total accelerated outstanding principal and accrued interest, together with any damages or costs of a lawsuit Tenant agrees to remain liable for all damages, Annual and Additional Rents resulting from such default for the entire lease term as liquidated damages, and landlord reserves the right to re-let the premises for his own benefit. Tenant shall be responsible for all attorney fees and court costs resulting from default and said costs shall be known as Additional Rent. The Tenant expressly agrees and promises to pay any and all costs, without limitation, incurred by the landlord, made necessary by Tenant violation of any covenant of this lease, including court costs, legal fees, Landlord administrative costs, all of which sums so incurred by the Landlord shall be due and payable by the Tenant before the Landlord shall be required to accept any rent then due from the Tenant, and unless such costs incurred by the Landlord are paid by the Tenant, Landlord shall have the right, at its option to refuse tender of any rent. At the option of the Landlord, any sums tendered by the Tenant may be applied by the Landlord to the payment of all such costs incurred by the Landlord from sums so tendered first, and the balance of such sums applied to the payment of rent, and if such sum is insufficient to pay all of the rent the balance then remaining unpaid shall be deemed and carried as unpaid rent, and for which unpaid sums, the Landlord may proceed to execute a Writ of restitution on any outstanding judgment which it may have for possession based on non payment of rent expressed in the complaint on which such judgment for possession is based, plus any and all rent which has accrued and become due since entry of judgment for possession, it being expressly agreed, that all of the aforesaid costs incurred by the Landlord shall be included and covered by such judgment for possession.

4

19.    WAIVER

The waiver of one condition of this lease does not waive or affect other conditions of the lease.

20.    ABANDONMENT

If Tenant shall abandon, quit or vacate the premises voluntarily or involuntarily without the written consent of the Landlord, Tenant shall remain liable for all Annual and Additional Rents or other sums of money including damages as a result of Tenant abandoning or vacating the premises. Landlord may relet the premises, and in the event of such reletting, all expenses incident to re-letting, as well as any costs or damages sustained due to Tenants' use and occupation of premises shall be borne by the Tenant. The Landlord re-letting the premises shall not be deemed to constitute an election by Landlord to terminate the Lease or Tenants right to possession thereunder.

21.    WAIVER OF JURY TRIAL

Landlord and Tenant hereby expressly waive trial by jury, in any action or proceeding or counterclaim brought by either party against the other party, or any other matter, directly or indirectly or arising out of or with respect to this Lease, including without limitation, the relationship of Landlord and Tenant, the use and occupancy by Tenant of the Premises, or any statutory remedy(s) and/or claim(s) of injury or damage regarding this lease.

22.    RULES AND REGULATIONS

Tenant covenants and agrees that all rules and regulations set forth herein or hereafter adopted by the Landlord and made known to the tenant shall have the same force and effect as covenants of this lease. Tenant covenants that he, his family, guests and invitees shall conduct themselves in the premises, common areas and entrances as required by the rules and regulations.

23.    LOCKS AND KEYS

No additional locks shall be placed upon any doors of the premises.  Upon the termination of this lease, the tenant shall surrender to the Landlord all keys to the premises.  In the event the tenant changes the locks or adds additional locks without written permission from the landlord, tenant shall immediately provide Landlord with a duplicate key(s).  Any damages that may result to the premises as a result of Landlord not being able to gain access to the premises shall be borne by Tenant.

24.    MISCELLANEOUS

This lease shall be binding upon and inure to the benefit of the parties thereto, their respective heirs, executors, administrators and assigns. tenant acknowledges that the statements made in the application for the premises are true, that they are deemed a part of this lease and that the falsity of any of them shall constitute a breach thereof.

This Lease contains the final and entire agreement between the parties hereto, and neither they, nor their agents shall be bound by any terms, conditions, statements warranties or representatives, oral or written, not herein contained.

Tenant acknowledges and certifies that Tenant has read this entire agreement and knows the entire contents and understands all of them, and has signed this agreement voluntarily and that each and every provision is understood and agreed in its entirety.

WITNESS the following signatures on the day and year first appearing above.

LANDLORD _____    TENANT _Desiree M° Rae_____