# UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA CIVIL DIVISION

DAVID MEAD                                    )
8204 Moorland Lane                            )
Bethesda, Maryland, 20817                     )
                                              )
Jenise McRae,                                 )
1814 North Capitol Street, N.W., #3           )
Washington, D.C. 20001                        )
                                              )
          Plaintiffs , Pro Se                 )
vs.                                           )          Case # 1: 05CV02316
                                              )
Sue Ann Mahaffey                              )          (EMG)
Stein, Sperling and Bennett                   )
25 West Middle Lane                           )
Rockville, Maryland, 20850                    )
                                              )
Shahram Roudi                                 )
First Nationwide Management                   )
and Leasing, Inc.                             )
5125 MacArthur Boulevard, # Suite 41          )
Washington, D.C. 20016                        )
                                              )
Chao W. Chen                                  )
258 B. Market Street East                     )
Gaithersburg, Maryland 20878                  )
                                              )
Weichert Realtors, Inc., Principal            )
225 Littleton Road,                           )
Morris Plains, New Jersey, 07950.             )
                                              )
Kathleen Sheeran, Agent                       )
Weichert Realtors                             )
6610 Rockledge Drive, Suite 100               )
Bethesda, Maryland 20814                      )
                                              )
Michael J. Jagoda/Parcorp Services Ltd        )
Principal, Royal Investment Group LLC         )
931 West 75th Street, #137-317                )
Naperville, Illinois 60565-7202               )

**RECEIVED**

APR 1 9 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Nasser Shahparast, Agent, )
Royal Investment Group LLC )
5301 Goldsboro Road )
Bethesda, Md., 20817 )
 )
Timothy Crowley, Principal )
Kathleen Tiong, Agent )
Remax Realtors )
6 Montgomery Village Avenue #200 )
Gaithersburg, Maryland 20879. )
 )       )
Yona Mead )
5176 Linnean Terrace, N.W. )
Washington, D.C 20008 )
 )
  Defendants )
_____)

## SECOND AMENDED COMPLAINT FOR VIOLATIONS OF 42 U.S.C. 1985, VIOLATIONS OF THE FEDERAL FAIR HOUSING ACT OF 1968 AS AMENDED IN 1988, BREACH OF DISTRICT OF COLUMBIA HUMAN RIGHTS ACT, CONSPIRACY, FRAUD, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS AND DECLARATORY RELIEF IN THE SALE OF PROPERTY AT 8204 MOORLAND LANE, BETHESDA, MARYLAND.

Plaintiff, David Mead for this Amended Complaint against defendants Sue Ann Mahaffey, Shahram Roudi, Chao Chen, Kathleen Sheeran, Weichert Realtors, Michael Jagoda/Parcorp Services, Ltd, Nasser Shahparast, Royal Investment Group LLC, Kathy Tiong and Timothy Crowley of Remax Realtors, Yona Mead, and their successors (collectively the "Defendants"), alleges as follows:

## I. JURISDICTION

1. This Court has jurisdiction of the subject matter of this civil action pursuant to 42 U.S.C. Section 1985, the Federal Fair Housing Act of 1968 as further Amended in 1988;  28 U.S.C. 2201 and 2202;  11 U.S.C 46, 1990 " Supplemental Jurisdiction" and the federal question in that the matter in controversy exceeds the sum of $50,000.

## II.    THE PARTIES

2.    Plaintiff David Mead is a resident of Maryland and conducts business in the District of Columbia.

2a.    Plaintiff Jenise McRae is a resident of the District of Columbia and a victim of several 42 U.S.C. violations expressly detailed in the original complaint.

3.    Defendant Sue Ann Mahaffey has offices at 25 West Middle Lane, Rockville, Maryland and has a license to practice law in the District of Columbia.

4.    Defendant Shahram Roudi is licensed to practice real estate in the District of Columbia under the name First Nationwide Management and Leasing, Inc., and has offices at 5125 Macarthur Boulevard, # Suite 41, Washington, D.C., 20016.

5.    Upon information and belief, Chow Chen has a residence in Maryland and conducts business at 258 B. Market Street, East, Gaithersburg, Maryland 20878

6.    Weichert Realtors has its Corporate offices at 225 Littleton Road, Morris Plains, New Jersey, 07950 and is licensed to conduct real estate brokerage business in Maryland and the District of Columbia.

7.    Upon information and belief, Kathleen Sheeran, is a resident of Maryland and conducts real estate business from the local Weichert Realtors office at 6610 Rockledge Drive, Suite 100, Bethesda, Maryland 20814.

8.    Upon information and belief, Michael Jagoda /Parcorp Services, LTD are principals of Royal Investment Group LLC, a Maryland corporation with principal offices at 931 West 75th Street, #137-317, Naperville, Illinois 60565-7202.

9.    Upon information and belief, Nasser Shahparast has a residence at 5301

3

Goldsboro Road, Bethesda, Md., 20817 and is the registered agent for Royal

Investment Group LLC, a/k/a Foreclosure Real Estate Service, LLC, a Maryland

corporation registered to do business with the State of Maryland.

10.    Upon information and belief, Timothy Crowley is a resident of

Maryland and is the Principal Broker of Remax Realtors at 6 Montgomery Village

Avenue #200, Gaithersburg, Maryland 20879.

11.    Upon information and belief, Kathleen Tiong is a resident of Maryland

and conducts real estate business as an Agent for Remax Realtors at 6 Montgomery

Village Avenue #200, Gaithersburg, Maryland 20879.

12.    Upon information and belief, Defendant Yona Mead resides at 5176

Linnean Terrace, N.W., Washington, D.C 20008.

### III.    FACTUAL PREDICATE

All factual allegations set forth in this Complaint are hereby incorporated by reference

into each Count below.  Plaintiff hereby alleges the facts as follows:

13.    On October 6, 2000, defendant Yona Mead filed a Complaint for

Absolute Divorce in the Montgomery County, Md. Circuit Court (FL 13261) seeking

(1) divorce, (2) custody of minor child Rebecca Mead and (3) possession of the family

home located at 8204 Moorland Lane, Bethesda, Maryland.

14.    In February, 2001, defendant Shahram Roudi contacted plaintiff

representing himself as a licensed real estate appraiser and agent for defendant Mead.

At the time, plaintiff was co-owner and managing agent for four jointly-held marital

properties in Washington D.C. (see below).

4

15.    On April 17, 2001, pursuant to the Circuit Court Order (FL 13261),

defendant Mead was ordered to (1) vacate the family home. Plaintiff was ordered to

(2) take custody of minor child Rebecca Mead and (3) take use and possession of the

family home at 8204 Moorland Lane, Bethesda, Md. through April 30, 2004.

16.    On March 4, 2002, defendant Mead filed a Bankruptcy Petition in the

U.S. Bankruptcy Court in Greenbelt, Maryland.

17.    On March 7, 2002, pursuant to the Circuit Court Order, defendant

Mahaffey was ordered immediately sell the four jointly-held properties located in the

District of Columbia as follows:

    a.    223 Rittenhouse St., N.W., Washington, D.C.
    b.    1643 New Jersey Ave., N.W., Washington, D.C.
    c.    1812 North Capitol St., N.W., Washington, D.C.
    d.    5004 Brooks street, N.W., Washington, D.C.

18.    In addition to the above D.C. properties, Mahaffey was ordered to sell

the family home at 8204 Moorland Lane, Bethesda, Md. after April 30, 2004 when

plaintiffs' use and possession order ended.

19.    On April 19, 2002, the Promenade Nursing Home requested a Show

Cause hearing in the Supreme Court of New York, Queens County to: (1) remove

defendant Mead as Power of Attorney for grand aunt, Leni Benjamin; (2) to appoint a

legal Guardian for Meads' grand aunt, Leni Benjamin, and (3) to pursue recovery of

$300,000 in assets wrongfully withdrawn from Leni Benjamins' bank accounts by

defendant Mead (See Application for Guardian marked as Exhibit "A).

20.    On April 29, 2002 at the Show Cause hearing in the Supreme Court of

the State of New York, the Court Ordered: (1) that Barbara Berkowitz to be the

appointed Guardian over Leni Benjamin, (2) that Guardian Berkowitz immediately pursue recovery of the $300,000 wrongfully withdrawn from Leni Benjamin's' bank accounts by defendant Mead (see Supreme Court Order Marked as Exhibit "A-1).

21.     In May 2002, plaintiff objected to Mahaffey employing defendant Roudi in the sale of the D.C. properties based on: (1) the false representations that Roudi made to plaintiff and others in the Circuit Court case; (2) his agency relationship with defendant Mead, and (3) his weakness as an individual agent compared to more reputable and established real estate firms in the marketplace.

22.     On about June, 2004, defendant Mahaffey ignored plaintiffs' objections and executed the first of several "Exclusive Listing Agent" Agreements with Shahram Roudi, this first time to sell the property located at 223 Rittenhouse Street.

23.     On July 16, 2002, pursuant to the Supreme Court of New York Order dated April 19, 2002, Guardian Barbara Berkowitz filed a Proof of Claim in the U.S. Bankruptcy Court to recover the $300,000 in assets wrongfully withdrawn from Leni Benjamins' accounts by  defendant Mead (See Guardian Berkowitz cover letter, U.S. U.S. Bankruptcy Court $300,000 Proof of Claim; and a Cashier Check for $122,301.55 representing one of the withdrawals by Mead marked as Exhibits "B, B-1 and B-2").

24.     On July 19, 2002, plaintiff submitted an offer to Mahaffey to re-purchase the jointly-held property at 1643 New Jersey Avenue.   The offer was accepted.

25.     In August 29, 2002, defendant Mead filed a Motion in the Circuit Court case attempting to prevent the sale of the New Jersey Avenue property to plaintiff.

26.     On August 30, 2002, Mahaffey signed a second "Exclusive Agency Agreement" with defendant Roudi to sell the jointly-held property at 1812 North

Capitol Street with a list price of $695,000.

27.    On September 4, 2002, defendants' Roudi and Chao Chen forwarded a

contract offer to Mahaffey to purchase the 1812 North Capitol Street property for

$550,000 -- $145,000 less than the $695,000 list price in the Exclusive Agency

Agreement. The Chen contract specified "4 separate Addenda labeled as #1, 2, 3 and

4" on the face of the contract ( See Chen Contract, page 4 marked as Exhibit "C") and

had the following provisions:

    a.    a fully refundable deposit of $10,000 to Chen;
    b.    a 30-day financing contingency to Chen;
    c.    inspection contingency  performed within 7 days of the ratification date;
    d.    the contract to be "null and void" if not accepted within 3 days of offer;
    e.    specifically "as is" condition.

28.    On September 9, 2002, plaintiff submitted a purchase offer to Mahaffey

for up to 700,000 -- $150,000 greater than the offer from Roudi and Chen. Plaintiffs'

contract consisted of 2 separate Addenda:

    a.    an Escalation Clause up to $700,000;
    b.    a specific financing proposal.  No financing contingencies included.

29.    Sometime after September 9, 2002 and before September 17, 2002,

Mahaffey illegally disclosed to Roudi and Chen confidential information contained in

plaintiffs' contract, specifically the "Escalation Clause up to $700,000".

30.    Sometime after September 9, 2002 and before September 19, 2002,

Mahaffey, Roudi and Chen altered the original Chen contract that specified "4

separate addenda labeled as #1, 2, 3 and 4 " by inserting another addenda: "Escalation

Clause not to exceed $600,000", outside the terms of the original contract.

31.    Sometime after September 9, 2002 and before September 19, 2002,

Mahaffey, Roudi and Chen altered the original Chen contract a second time, crossing out "not to exceed $600,000" and inserting "$700,000" to match and defeat plaintiff's contract offer (See "Escalation Clause marked as Exhibit "C-1").

32.    From September 15, 2002 through April 2003, defendants' Roudi and Mead made a series of visits to the 1812 North Capitol St. property at a time when the building was 100% occupied by twelve low-income, African-American families.

33.    On September 19, 2002, defendants' Mahaffey Roudi and Chen executed the Chen contract for $700,000, twelve (12) days after the three (3) day contractual deadline upon which the contract was to be "null and void".

34.    On September 26, 2002, defendant Roudi met with his associate Serop Nersesian at the North Capitol St. property and produced a "Cursory Inspection Report" listing "$360,400 in structural deficiencies".

35.    On October 1, 2002, Roudi met again at the property with Richard McDowell of "Master Builder Inspection, Inc. and produced a repair estimate of $35,000 for Mahaffey.  The estimate was over five times the cost of the closest of three independent estimates of repair at the property (See Affidavit of Denise McRae dated August 21, 2003 marked as Exhibit "D") as follows:

|   |   |   |
|---|---|---|
| a. | Master Builder Inspection, Inc. | $35,000, |
| b. | DFC Management, Inc | $6,800 |
| c. | Warren Improvements | $3,900 |
| d. | Bey's Improvements | $2,800 |

36.    On October 15, 2002, Mahaffey reduced the price of the "as is" Chen contract from $700,000 to $588,000 based on Nersesians "Cursory Inspection Report" (See letter from Chen to Roudi dated October 14, 2002 Marked as Exhibit "C-2" and

Affidavit of Denise McRae dated August 21, 2003, # 7. Marked as Exhibit "D").

37.    On October 24, 2002, defendants' submitted the Chen contract to the Montgomery County Circuit Court for approval with the contract price of $700,000 ten days after Mahaffey reduced the price of the contract by $112,000 to $588,000.

38.    On November 3, 2002, the tenants at 1812 North Capitol Street received their "Right of First Refusal" notice from Mahaffey, thirty-five (35) days after the ten day notice requirement under District of Columbia law.

39.    On about November 5, 2002, Mahaffey signed the third "Exclusive Listing Agreement" with Roudi to sell the jointly-held property at 5004 Brooks Street.

40.    On about November 15, 2002, Shahram Roudi appeared at the 5004 Brooks Street home which was occupied by Affiant Nattonnia Ross, an African-American woman and mother of four children. Ms. Ross had an existing lease that ran through May 31, 2003.

41.    On or about November 23, 2002, Shahram Roudi appeared at the Brooks St. property without notice and asked if he could enter the home to "check things out". When Nattonnia Ross refused, defendant Roudi became angry and had a heated conversation with her.

42.    On December 15, 2002, Affiant Denise McRae and the African-American tenants at 1812 North Capitol St. timely notified Mahaffey that they had duly organized as "Affordable Housing Choices, LLC" to purchase their building.

43.    Beginning on the last week of December 2002, defendant Roudi made a series of seven additional appearances without notice to the 5004 Brooks Street property. On one occasion, Roudi was accompanied by a white female. Roudi

informed Nattonnia Ross that the woman was the "new owner" with plans to do major renovations while the family lived in the home.

44.    A few days later, Roudi appeared again with the "new owner" and informed Ms. Ross that her family would have to move out during the renovations.

45.    On about January 6, 2003, Shahram Roudi arrived at the home with a white male but was not allowed into the home by Affiant Ross. This time, Roudi repeatedly pounded on the front door and forcibly tried to enter her home through the side and back doors.

46.    On about January 12, 2003, defendant Roudi appeared again with a white male. Ms. Ross' sister, Georgia Ross, was upstairs at the time taking a bath. Roudi persuaded the children who answered the door to let him in. Roudi and the other man walked unescorted throughout the home, including the upstairs bathroom where Ms. Ms. Georgia Ross was bathing. Defendant Roudi advised Ms. Ross that: (1) the home was sold; (2) that the family no longer belonged there and (3) the family had to immediately move because Roudi was going to cut the utilities off.

47.    On about January 12 and 13, 2002, Nattonnia Ross and her mother made several calls to Mahaffey regarding the January 12 incident. Defendant Mahaffey did not return any of the phone calls.

48.    On about January, 20, 2003, fearing for the safety her family, Nattonnia Ross called defendant Roudi and agreed to move out, except that she couldn't afford the cost. Roudi advised Ms. Ross to contact defendant Mahaffey to "get some money". Ms. Ross and her mother made several calls to Mahaffey over the next few days. Again, Mahaffey did not return any of the phone calls.

49.    On January 25, 2003, Ms. Ross and her family vacated their home under duress, four months prior to her lease expiration.  The home remained vacant and boarded up until defendants' Mahaffey and Roudi sold it 14 months later on March 15, 2004.  (See Nattonnia Ross Affidavit dated June 11, 2003 in support of paragraphs 41 to 50 Marked as Exhibit "E").

50.    On February 5, 2003, a Petition for Failure to Pay Child Support was filed against defendant Mead regarding the Circuit Court Order dated March 7, 2002.

51.    On April 2, 2003 defendant Mead appeared at the 1812 North Capitol Street property without notice, knocking on all the tenant doors and announcing that she was representing the "new owners" and that the tenant organization, Affordable Housing Choices, LLC, was "illegal".

52.    On April 14, 2003, four months after Affordable Housing Choices LLC notified Mahaffey that they had organized to purchase their building, Mahaffey forwarded a copy of the Chow Chen contract to the tenants.

53.    On April 29, 2003, within the fifteen (15) day time frame allowed, Affordable Housing Choices, LLC sent a contract offer to Mahaffey that matched Chen's $700,000 contract that was later altered to $588,000.

54.    On September 5, 2003, five months after Mahaffey received the matching offer from Affordable Housing Choices LLC, Mahaffey executed the contract with Affordable Housing Choices, LLC, but demanded that the contract price be $593,000, $5,000 greater than the Chen contract. (See Affidavit of Denise McRae dated August 21, 2003 in support of paragraphs 52 to 55 Marked as Exhibit "D").

55.    On November 13, 2003, eleven months after Affordable Housing Choices

notified Mahaffey of their intention to purchase their building, Mahaffey authorized

work to renovate three units (25% of total) that were left vacant for almost a year.

56.    On April 27, 2004, a Second Petition was filed in Montgomery County

Circuit Court for defendant Meads' Failure to Pay Child Support of Minor Child.

57.    On May 4, 2004, Affordable Housing Choices assigned their contract

rights to plaintiff after encountering insurmountable obstacles in obtaining purchase

financing because of the 25% vacancy sustained by Mahaffey from the previous year.

58.    On May 1, 2004, Mahaffey notified plaintiff that she was going  to sell

the family home at 8204 Moorland Lane, Bethesda, Md. pursuant to the March 17,

2002 Circuit Court Order.

59.    On about May 10, 2004, defendant Kathleen Sheeran of Weichert

Realtors toured the home with defendant Sheerans' appraiser, Spirit Realty, Inc.

While touring the second floor, Sheeran refused to enter an 800 sq. ft. "studio" (25% of

total space) portion of the home because of an expressed severe phobia of a pet ferret.

60.    On about May 17, 2004, Spirit Realty issued its report on the 8204

Moorland Lane home listing the appraised value of $683,000.

61.    On May 28, 2004, the settlement occurred on the assigned 1812 North

Capitol St. contract.  At the settlement offices of Paragon Title, defendant Mahaffey

informed the plaintiff that she had "sat on the bench with Montgomery County

Circuit Court Judge Ryan" for several years.

62.    On May 30, 2004, defendant's Sheeran and Weichert conducted an

"open house" at the 8204 Moorland Lane home.  Sheeran represented to the potential

buyers that the "studio" in the home was an "accessory apartment".  Sheeran had

never entered or seen the studio. In the absence of Sheeran showing the studio,

plaintiff escorted the potential buyers through the studio during the open house.

63.     On June 9, 2004, Mahaffey filed a Motion in the Circuit Court seeking to

remove plaintiff and his minor child from their home. The Motion was based on false

statements by Sheeran that plaintiff and minor daughter "interfered" in the open

house; that the home was in "deplorable" condition, and that "animals were running

all over the house" (See Affidavit from Dr. Jasmine Salloum belying Sheerans'

misrepresentations Marked as Exhibit "F").

64.     On June 22, 2004, plaintiff informed Mahaffey that Leslie Radcliffe of

Weichert who was present at the open house thanked plaintiff for his assistance at the

open house. Plaintiff also provided Mahaffey with the names of five additional real

estate agents as evidence to support plaintiffs' cooperation during the open house and

to belie Sheerans' untruthfulness. Mahaffey ignored all of plaintiffs' references.

65.     During June, 2004, Weichert received several offers on the home. One

was from defendant Shahram Roudi for $500,000 -- $183,000 less than the appraised

value. The others included the highest offer at $787,000, -- $104,000 above the

$683,000 appraised value.

66.     At about the same time, Plaintiff submitted an offer to Mahaffey.

Plaintiffs offer matched the highest $787,000 offer (See Mead contract dated July 20,

2004 marked as Exhibit "G").

67.     On about the end of June 2004, the first $787,000 offer was withdrawn

before it was accepted.

68.     On about July 15, 2004, plaintiff pressed Mahaffey to accept his highest

13

$787,000 offer.   Mahaffey refused, citing standard industry conditions in plaintiff's

financing commitment from the State Employees' Credit Union.

69.     On July 23, 2004, the Circuit Court heard the Mahaffey/Sheeran Motion.

Sheeran asserted at the hearing that the home would sell for a substantially higher

price if plaintiff and minor daughter vacated the home.  Judge Ryan stated he would

rule based on Mahaffeys' recommendation.  Mahaffey recommended that the plaintiff

and minor child vacate the home. Judge Ryan ordered plaintiff and child to vacate by

August 6, 2004.  However, Judge Ryan also directed that the plaintiff should be

allowed to fairly compete for the purchase of his home.  He then asked Mahaffey to

draft the Order for him to sign in accordance with the hearing.

70.     Defendant Mahaffey drafted the order, however, she inserted in the

order that she not be required to accept plaintiffs' bid on his home, contrary to the

Judges' comments at the hearing.  Apparently, Judge Ryan did not read the wrongful

insertion and signed the Order on August 5, 2004.

71.     On August 6, 2004, plaintiff complied with Judge Ryans' order and

vacated the home on August 6, 2004.

72.     From August 6, through September 2004, Sheeran and Mahaffey

resumed marketing the home with additional "open houses". Throughout this time,

the real estate market was experiencing extraordinary growth in home sale prices.

73.     On August 10, 2004, plaintiff contracted with Mr. Dale Richenbach, Neil

Baylin and Ms. Vanda Greenwood of Weichert Realtors to represent him as the buyer

in securing the re-purchase of his home.

74.     On about August 20, 2004, defendant Sheeran notified Richenbach and

Greenwoood that Mahaffey imposed a deadline of August 27, 2004 for plaintiff to submit an offer on the home.

75.    On about August 20, 2004, defendant Sheeran informed Vanda Greenwood, that defendants had the plaintiff and daughter thrown out of his house.

76.    On August 26, 2004, Weichert Realtors provided plaintiff with a loan commitment of up to $850,000.

77.    On August 27, 2004, Plaintiff submitted an offer to Mahaffey for $761,000 which included an Escalation Clause of up to $850,000.

78.    On September 9, 2004, plaintiff submitted a Financial Information Sheet through Dale Richenbach at Weichert at the request of Mahaffey.

79.    On about September 15, 2004, defendant Nasser Shahparast, registered agent of "Foreclosure Real Estate Services LLC", changed its registered name with the State of Maryland to "Royal Investment Group LLC".

80.    On about September 15, 2004, defendant Mahaffey contacted Neil Baylin of Weichert Realtors to inquire about plaintiffs' financial commitment from Weichert.

81.    On September 17, 2004, Neil Baylin informed plaintiff of his September 15, 2004 conversation with Mahaffey and that Mahaffey sounded very disappointed in learning that Weichert had provided a financial commitment to purchase the home.

82.    On September 21, 2004, plaintiff contacted Mahaffey for an update on his purchase offer, advising that his Commitment Letter from Weichert dated August 26, 2004 was in danger of expiring.  Mahaffey denied that she set a deadline for accepting offers and stated that the home was still being marketed with several interested parties.

83.     On September 28, 2004 at 3:00 p.m., Weichert informed plaintiff that Mahaffey would accept his offer but only if the offer included a cashier's check for $55,000 by 5:00 pm the same day.   The demand was based on information provided by defendant Mead to Mahaffey from subpoenaed documents obtained by defendant Mead in her U.S. Bankruptcy Court case.

84.     On September 28, 2004, plaintiff asked Mahaffey through Weichert for a more reasonable time than two hours to come up with a $55,000 deposit.  As a good faith gesture, plaintiff increased his purchase offer from $761,000 to $787,000.

85.     On September 29, 2004, Mahaffey declined plaintiff's $787,000 offer, giving plaintiff one more business day to provide the $55,000 cashier's check. Mahaffey did this with the full knowledge provided from defendant Mead that it was impossible for plaintiff to comply with the demand within the time frame specified.

86.     On September 30, 2004, Mahaffey signed the $745,000 contract with defendant "Royal Investment Group, LLC"/Parcorp Services Ltd.

87.     On about September 30, 2004 Mahaffey and defendant Mead filed a Motion in the U. S. Bankruptcy Court seeking approval to sell plaintiff's home to defendant "Royal Investment Group. LLC".

88.     Some time after September 30, 2004, the "Royal Investment Group, LLC" contract was altered by Mahaffey, Sheeran, Weichert, "Royal Investment Group, LLC" Remax and Tiong, by inserting defendant Tiongs' name above the "Royal Investment Group LLC" name.

89.     On about October 5, 2004, defendant Sheeran informed Weichert agent Vanda  Greenwood, that defendants knew all along that the plaintiff couldn't come up

with the $55,000 Cashier's Check within the time required.

90.    On October 15, 2004, plaintiff and minor daughter noticed an intruder at the family home while picking up mail. Plaintiff knocked on the door but no one answered. when he called out that he would call the police, defendant Tiong appeared at the door. Plaintiff asked Tiong to identity herself and why she was inside the home. Tiong refused to give her name, but stated that she was the Remax agent for "Foreclosure Real Estate Services" and that Sheeran gave her access to the home.

91.    On October, 15, 2004, the U.S. Bankruptcy Court heard the Mahaffey /Mead Motion. Defendants' presented evidence in support of the $745,000 offer to Royal Investment Group. Plaintiff presented evidence of his $787,000 offer. After hearing both sides, Judge Paul Mannis unequivocally opined that the highest legal offer should prevail. He concluded the hearing by Denying the Motion to sell the home to "Royal Investment Group, LLC", subject to defendant Mahaffey filing an Adversary Proceeding to hear all the evidence before ruling on the issue (see U.S. Bankruptcy Court Order dated November 9, 2004 Marked as Exhibit "H").

92.    From October 15, 2004 through June 22, 2005, Mahaffey refused to file the Adversary Proceeding in accordance with the November 9, 2004 Court Order.

93.    On about November 1, 2004, Mahaffey informed plaintiff that defendant Tiong was no longer going to be the agent representing "Royal Investment Group LLC" but rather she was the "new owner" of his home.

94.    Upon information and belief, defendant Tiong continued to have access to the home through March, 2005. During this time, major larceny occurred in the home. In March 2005, Mahaffey reported the theft to Montgomery County Police.

The police informed plaintiff that there was no evidence of a break-in in the home. Upon information and belief, defendants' Mahaffey, Sheeran and Tiong were the only people with secured access to the home during this time.

95.    On December 6, 2004, the Circuit Court heard a Motion brought by plaintiff to contest the sale of the home to "Royal Investment Group, LLC"/ Tiong. After hearing both sides, Judge Ryan asked the parties to submit memorandums in support of their positions.

96.    On December 6, 2004 in the lobby after the hearing, Mahaffey declared to plaintiff and attorney Glen Cooper that: "I don't care who purchases the home and I have no intention of submitting a memorandum to support the sale" (to Royal Investment Group LLC).  During the conversation, Judge Ryan was jokingly referred to as "Jimmy".

97.    On about December 13, 2004, Mahaffey submitted a memorandum to support the sale to defendants' "Royal Investment Group"/Tiong" contrary to her declarations in the December 6, 2004 courthouse lobby.

98.    In January 6, 2005, Judge Ryan approved the sale to defendants "Royal Investment Group LLC"/ Tiong at the lower $745,000 purchase price, consistent with the Judges' July 23, 2004 declaration that he would rule based on whatever Mahaffey recommended.

99.    On about May 5, 2005, plaintiff learned from the State of Maryland that defendants' Michael Jagoda Nasser Shahparast had falsely registered the business "Royal Investment Group, LLC" by providing false information regarding the principal and agents' name and address as registered with the State

18

100.    On about May 5, 2005, plaintiff learned from the Florida Department of State that neither defendants' Michael Jagoda nor Parcorp Services Ltd were duly organized or registered as a business organization as required under Florida Law, nor was the address 13799 Park Boulevard N. # 258 Seminole, Florida provided to the State of Maryland a valid address for the defendants Michael Jagoda/Parcorp Services, Ltd.

101.    On June 22, 2005, plaintiff filed an Adversary Proceeding in the U.S. Bankruptcy Court consistent with the U.S. Bankruptcy Court Order dated November 9, 2004 to determine which of the two purchase offers – either plaintiffs' $787,000 offer or Royal Investment Groups' $745,000 offer.  Plaintiff filed the proceeding after defendant Mahaffey repeatedly refused to do so.

102.    On about June 22, 2005 defendants' Royal Investment Group, Nasser Shahparast and Michael Jagoda refused service of process in the Adversary Proceeding at their addresses as registered with the State of Maryland.

103.    On about June 29, 2005 defendant Mead's case in the U.S. Bankruptcy Court was dismissed three years after it was filed (see U.S. Bankruptcy Court Order dated July 11, 2005 Marked as Exhibit "I").

104.    On July 13, 2005 plaintiffs' underlying Adversary Proceeding was dismissed as moot because of defendant Meads' bankruptcy petition was dismissed (see U.S. Bankruptcy Court Order dated July 12, 2005 Marked as Exhibit "J").

## COUNT ONE

### Conspiracy to Commit Fraud and Fraud

105.    Plaintiff repeats and alleges each allegation contained in this complaint as if specifically set forth herein.

19

106.    Defendants Mahaffey, Roudi, Chen, Sheeran, Weichert Realtors, "Royal Investment Group, LLC", Jagoda, Parcorp Services, Shahparast, Tiong, Crowley, Remax Realtors and Mead by their actions over a four year period of time intentionally and knowingly made false representations of material facts to the plaintiff (and to D.C. low-income African-American families, the Montgomery County Circuit Court , the U.S. Federal Bankruptcy Court, the Florida Department of State, the Maryland State Department of Taxation and Assessments and others) with the concerted intent to mislead and defraud plaintiff in fulfillment of their goals.

107.    Defendants' Mahaffey, Roudi, Chen, Sheeran, Weichert Realtors, Jagoda, Parcorp Services, Shahparast, Tiong, Crowley, Remax Realtors and Mead engaged in a concerted pattern of activity in furtherance of their collective scheme which was intended to and ultimately did defraud and damage plaintiff and African-American families and caused the injuries alleged herein.

108.    Plaintiff relied upon the representations of Mahaffey, Roudi, Chen, Sheeran, Weichert Realtors, "Royal Investment Group, LLC", Jagoda, Parcorp Services, Shahparast, Tiong, Crowley, Remax Realtors and Mead and suffered the resulting damage herein.

109.    Defendant Roudi appeared in the Montgomery County Circuit Court case (FL13261) in February 2001 representing himself as a real estate appraiser and agent for defendant Mead.  In fact, Roudi was not a real estate appraiser but rather a real estate sales agent.  Roudi continued his misrepresentations through 2001 while conspiring with defendant Mead with the goal of preventing the plaintiff from re-purchasing his properties and, by extension, destroying his livelihood.  Roudi was

motivated to sell plaintiffs' properties to third parties to obtain sales commissions which Mahaffey willingly facilitated to the substantial expense of the plaintiff.

110.    Beginning in May 2002, defendant Mahaffey joined the Mead/Roudi scheme to defraud plaintiff from his business and livelihood. Soon after Mahaffey took control over the sale of the four D.C. properties, Mahaffey engaged in a three year pattern of activity enabling the scheme by awarding co-conspirator Roudi with the first of three contracts to sell the 223 Rittenhouse St. property. Rather than use the industry standard Open Listing Agreement, Mahaffey enriched Roudi with Exclusive Agency Agreements without cause or justification at the expense of plaintiff.

111.    Defendants' Mahaffey, Mead and Roudi continued there scheme by awarding the second "Exclusive Agency Agreement" to Roudi on August 30, 2002 to sell the North Capitol Street property with a list price at $695,000. Four days later on September 4, 2002, defendant Chao Chen joined the conspiracy by submitting to Mahaffey what turned out to be a fraudulent contract offer of $550,000 --$145,000 less than the $695,000 list price. The Chen contract offer contained "4 specific contract Addenda labeled # 1, 2, 3 and 4". Five days later on September 9, 2002, plaintiff submitted a contact offer with an Escalation Clause of up to $700,000 -- $150,000 greater than the Chen offer.

112.    Defendants Chen, Roudi and Mahaffey then began a series of deceptive actions on the $550,000 Chen offer for the collective purpose of defeating plaintiffs' $700,000 offer as follows: (1) sometime before September 17, 2002, Mahaffey disclosed plaintiffs' confidential contract offer to Chen, specifically the "Escalation Clause up to $700,000"; (2) defendants then fraudulently altered the Chen contract by inserting a

fifth Addenda outside the original contract "with four Addenda labeled #1, 2, 3and

4"with an "Escalation Clause up to $600,000"; (3) defendants then altered the

fraudulent contract again, crossing out "up to $600,000 " and inserting "up to

$700,000" to match and ultimately defeat plaintiffs' offer ; (4) on October 14, 2002,

Mahaffey again altered the Chen contract for a third time by reducing the price by

$112,000, from $700,000 to $588,000 to approximate the original Chen offer of $550,000;

(5) on October 24, 2002, defendants submitted the fraudulent Chen contract to

Montgomery County Circuit Court for approval in the amount $700,000, deceptively

withholding the $112,000 reduction to Chen to create the appearance to the Court that

it matched plaintiffs' $700,000 offer. This transparent fraud was in furtherance of their

scheme to damage and defraud plaintiff, while at the same time unfairly enriching the

defendants at the expense of the plaintiff.

113.    On about November 5, 2002, defendants' Mahaffey, Mead and Roudi

continued their conspiracy by awarding a third "Exclusive Agency Agreement" to

Roudi in the sale of the property at 5004 Brooks Street, N.E. D.C. The property was

the home of Ms. Nattonnia Ross and her four children. Ms. Ross had a lease term that

ran through May 31, 2003. As an agent of Mahaffey and Mead, Roudi began a series

of outrageous actions.  In late November 2002, he appeared, as always, without notice

and asked Ms. Ross if he could enter the home to "check things out".  When she

refused, he had a heated conversation with her.  A few days later, he appeared with a

white female that he identified as the "new owner".  Roudi advised Ms. Ross that they

planned major renovations while the Ross family lived in the home.  A few days later

they appeared again and he informed Ms. Ross that her family would instead have to

move during the renovations.

114.    On January 6, 2003, when Roudi appeared, Ms. Ross would not allow him in. Roudi pounded on the front door and tried to forcibly enter through side and basement doors. On January 12, 2003, he appeared again with a white male. This time Ms. Georgia Ross was upstairs taking a bath. Roudi persuaded the young children who answered the door to let them in. The two men walked unescorted through the home, including the upstairs bathroom while Ms. Ross was bathing. Defendant Roudi informed Ms. Ross that: (1) their home was sold; (2) the family no longer belonged there and had to move; (3) he intended to cut off the utilities. On January 13, 2003, Ms. Ross and her mother made several calls to Mahaffey regarding the January 12 incident. Mahaffey did not return the calls. On about January, 20, fearing for her families' safety, Ms. Ross talked to Roudi on the phone. Ms Ross agreed to move because of the outrageous circumstances but could not afford the move. Roudi advised Ms. Ross to contact Mahaffey to "get some money". Ms. Ross and her mother made several more phone calls to Mahaffey, but Mahaffey, again, did not return the calls. On about January 25, 2002, the Ross family under extreme duress vacated their home.

115.    From January 25, 2003 to March 15, 2004, the home sat boarded-up and vacant. On March 15, 2004, the defendants sold the home and took their fees. None of the "new owners" that Roudi marched through the home were new owners. Rather, it was part of an insidious and outrageous plan to intimidate the family into leaving their home - four months before their lease expired - so they could sell the vacant home to a third party. The underlying motive was race and fee-based, at the

substantial cost and loss to the plaintiff.

116.    The conspirators' on-going fraud did not stop with the sale of the four jointly-owned District of Columbia properties.  On May 1, 2004, defendant Mahaffey notified plaintiff of her intention to market his home for sale.  On May 30, 2004, defendants' Sheeran and Weichert conducted an "open house" and received several purchase offers as a result.  The highest offer was for $787,000, $104,000 higher than the appraised value.  Again, as in the case of the 1812 North Capitol St. property, plaintiff matched and exceeded the highest offer. Notwithstanding, Sheeran made false and malicious representations to Mahaffey about the "open house" as a basis for Mahaffey filing a Motion in the Circuit Court to order plaintiff and his minor child from the home.  The Motion was heard on July 23, 2004 by Judge James Ryan. Sheeran asserted at the hearing that the home would sell for a substantially higher price if plaintiff and daughter were ordered to vacate.  Based on Sheerans' reckless assertions, the Judge ordered plaintiff and daughter to vacate the home by August 6, 2004.  However, Judge Ryan directed that the plaintiff should be allowed to fairly compete for the purchase of his home.  The judge then asked Mahaffey to draft the Order for him to sign.  Mahaffey wrote the order as requested, however, she deceptively inserted in the order that plaintiff be denied the right to purchase his home, contrary to Judge Ryan's' directive.  Apparently, Judge Ryan did not read the wrongful insertion, and signed the order as written by Mahaffey.

117.    In early August 2004, defendants resumed the "open houses" and received several additional offers.  The highest offer was $760,000.  Again, plaintiff submitted a higher offer at $761,000 including an Escalation Clause up to $850,000.

Again, Mahaffey refused to accept plaintiffs' offer, obstructing with the ultimate goal of preventing plaintiff from purchasing his home. At the same time, Mahaffey was concurrently using the illegitimate "Foreclosure Real Estate Services LLC" as a foil to plaintiffs' contract. During this time, "Foreclosure Real Estate Services" had misrepresented to the State of Maryland that its' principal offices in were in Florida under the name Michael Jagoda/Parcorp Services, Ltd. In fact, no such organization or persons were registered with the Florida Department of State.

118.    On about September 10, 2004, defendant Nasser Shahparast, the agent for "Foreclosure Real Estate Services, changed its name to "Royal Investment Group, LLC" prior to Mahaffey ratifying the contract with "Royal Investment Group LLC".

119.    On September 30, 2004, Mahaffey signed a $745,000 contract with "Royal Investment Group", $42,000 less than  plaintiffs' $787,000 verbal offer to Mahaffey on September 28, 2004. Sometime after September 30 and before October 15, 2004, Mahaffey, Sheeran, Weichert, Tiong, Remax flipped the "Royal Investment Group, LLC" contract to Kathy Tiong, who later represented that she was acting as the Agent for  "Foreclosure Real Estate Services to conceal and disguise their activities.

120.    On about October 10, 2004, plaintiff and his daughter discovered defendant Tiong inside the family home. When confronted, defendant Tiong identified herself as the Remax Agent for the buyer, "Foreclosure Real Estate Services, LLC". On about October 15, 2004 , the "Royal Investment Group, LLC" contract was fraudulently altered by defendants by adding the name Kathy Tiong above "Royal Investment Group, but leaving the alteration undated. These series of actions closely resembled the defendants' prior pattern of deceit in the 1812 North Capitol St.

contract fraud by deceptively altering purchase contracts in furtherance of the collective goal of defrauding plaintiff from his business properties and home.

121.    On October 15, 2004, the United States Bankruptcy Court heard a Motion filed by Mahaffey through defendant Meads' lawyer to sell plaintiff's home at the lower $745,000 offer to "Royal Investment Group, LLC". Plaintiff presented evidence of his $761,000 contract offer with unconditional financing.  After hearing both sides, Judge Paul Mannis Denied the Mahaffey/Mead motion to sell the home to "Royal Investment Group, LLC" and stated his unequivocal view that the highest offer (plaintiffs) should prevail, subject to Mahaffey filing an underlying Adversary Proceeding in defendant Meads' Bankruptcy case.  From October 15, 2004 through June 22, 2005, Mahaffey refused to file the Adversary Proceeding to avoid both the scrutiny of the United States Bankruptcy Court and the exposure to their conspiracy and fraud that would have resulted from the proceeding.

**WHEREFORE:** Plaintiff demands judgment against defendants' Mahaffey, Shahram Roudi, Chao Chen, Kathleen Sheeran, Weichert Realtors, "Royal Investment Group, LLC" Michael Jagoda/Parcorp Services Ltd, , Nasser Shahparast, Timothy Crowley, Remax Realtors, Kathy Tiong and Yona Mead in connection with this Count in the amount of $2,000,000 each for compensatory damages and $150,000 each for punitive damages, together with reasonable attorneys fees, costs, and such other relief as this Court deems proper.

## COUNT TWO

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

122.   Plaintiff repeats and alleges each allegation contained in this complaint as if specifically set forth herein.

123.   Defendants' acts as alleged constituted extreme and outrageous conduct.

124.   Defendants' acts as alleged herein were undertaken intentionally, maliciously, beyond the bounds of all decency and with reckless disregard for both the truth and consequences of their actions, i.e., irreparable injury to plaintiff and to his minor child, especially since the defendants' knew about all the years and importance that plaintiff had devoted to providing a stable, secure and loving family life to his minor child in the absence of the mother.

125.   Defendants' had knowledge that their acts would cause plaintiff and the minor child to suffer severe emotional distress, mental suffering and anguish and defendants acted with malice with and intent to cause the severe emotional distress, suffering and anguish that resulted form their actions.

126.   As a result of defendants outrageous conduct, plaintiff and his minor child have  suffered damages, including severe emotional distress, extreme mental suffering and mental anguish, the full extent of which are not yet known but which in fact resulted  from the malicious acts and wrongful schemes of the defendants.

**WHEREFORE:** Plaintiff demands judgment against defendants' Mahaffey, Shahram Roudi, Chao Chen, Kathleen Sheeran, Weichert Realtors, "Royal Investment Group, LLC" Michael Jagoda/Parcorp Services, Ltd, Nasser Shahparast, Timothy Crowley, Remax Realtors, Kathy Tiong and Yona Mead in connection with this Count in the amount of $2,000,000 each for compensatory damages and $150,000 each for punitive damages, together with reasonable attorneys fees, costs, and such other relief as this

Court deems proper.

## COUNT THREE

### VIOLATIONS OF 42 U.S.C. SECTIONS 1985

127.    Plaintiff repeats and alleges each allegation contained in this complaint as if specifically set forth herein.

128.    The Female-head of the families at 1812 North Capitol Street and 5004 Brooks Street, specifically Affiants Denise McRae and Nattonnia Ross in this action, are members of a protected class, and defendant Shahram Roudi exhibited and had a class-based animus against women in general, and the Affiants specifically who are female. These female-head of families best interests' were served well by plaintiff in providing their families with decent, secure and stable housing in which to raise their children. Defendant Roudi caused irreparable harm to Affiants and their families.

129.    After conspirators Mahaffey, Roudi and Chen acted to prevent the sale of the 1812-14 North Capitol Street to plaintiff, the defendants continued their wrong doing by attempting to prevent Affiants Denise McRae and Nattonnia Ross and other female-head of families to purchase their homes because of their class-based animus.

130.    From December 15, 2002 through September 2003, after Affiant Denise McRae and the female tenants at 1812 North Capitol Street had organized to purchase their building, conspirators Mahaffey, Roudi, Mead and Chen knowingly and repeatedly intimidated the tenants with verbal abuse and illegal visits to their homes to discourage and defeat the tenants legal Right to purchase their building.

131.    From September 19, 2002 through August 29, 2003, defendants' Mahaffey, Chen and Roudi knowingly and willfully employed a series of delay tactics against Affiant Denise McRae to purchase the1812 North Capitol St. property as

28

follows: (1) after Mahaffey executed the Roudi/Chen contract on September 19, 2002, the tenants did not receive the required ten (10) notice until November 3, 2002, forty-five (45) days after the contract was executed; (2) from December 15, 2002 to April 17, 2003, Mahaffey ignored the tenants notice of intent to purchase their building.

132.    From April 28, 2003 through April 2004, Mahaffey, Roudi and Chen knowingly and repeatedly conspired and did so obstruct and delay the tenants Right to purchase by; (1) refusing to execute the tenant contract until August 29, 2003, using false excuses by Mahaffey in seeking legal advice when she in fact is a licensed lawyer in the District; at multiple other times Mahaffey used her legal acumen to discourage and defeat the execution of the contract; (2) from January 2003 through January 2004, Mahaffey foiled the tenants purchase by refusing to renovate the three (25%) vacant units, making it impossible to obtain the purchase financing to buy their building.

133.    From December 2002 though May 2003, defendants' Mahaffey and Roudi knowingly and maliciously forced female Affiant Nattonnia Ross and her family to abandon her home at 5004 Brooks St. through the use of systematic, outrageous and illegal behavior to the severe detriment of the Ross family.

134.    Defendants and each of them conspired in their actions at the Brooks St. property because: (1) they did not want female Affiant Nattonnia Ross to purchase her home and (2) they knew they couldn't sell the home while Nattonnia Ross and her family lived there under a valid lease, rendering defendants unable to collect their fees

135.    Defendants Mahaffey, Chao Chen, Shahram Roudi and each of them conspired and did so conspire for the purpose of for depriving the Affiants' Denise McRae and Nattonnia Ross of the equal protection of laws, and Affiants Denise

29

McRae and Nattonnia Ross were injured by acts done in furtherance of the conspiracy

and fraud and the attainment of each of the defendants' ultimate goals.

**WHEREFORE:** Plaintiff demands judgment against each defendants' Mahaffey,

Roudi, Chen and Mead in connection with this Count in the amount of $2,000,000

each for compensatory damages and $150,000 each for punitive damages, together

with reasonable attorney fees, costs, and such other relief as this Court deems proper.

### COUNT FOUR

### VIOLATIONS OF DISTRICT OF COLUMBIA HUMAN RIGHTS ACT 1 D.C. CODE SECTION 1-2501 ET SEQ.

136.    Plaintiff repeats and alleges each allegation contained in this complaint

as if specifically set forth herein.

137.    Affiants Denise McRae and Nattonnia Ross are African-Americans and

members of a protected class, and defendants Mahaffey, Roudi and Chen exhibited

and had a race-based animus against African-Americans in general and with Affiants

Denise McRae and Nattonnia Ross in particular, whose family interests were served

by plaintiff providing decent, safe, secure and stable homes to raise their children.

138.    Defendants Mahaffey, Chen, Roudi and Mead conspired and acted in

furtherance of their conspiracy to prevent African-Americans' Denise McRae and

Nattonnia Ross to purchase their homes at 1812 North Capitol and 5004 Brooks St.

139.    From December 15, 2002 through September 2003, after Affiant Denise

McRae and the female tenants at 1812 North Capitol Street had organized to purchase

their building, conspirators Mahaffey, Roudi, Mead and Chen knowingly and

repeatedly intimidated the tenants with verbal abuse and illegal visits to their homes

to discourage and defeat the tenants legal Right to purchase their building.

140.    From September 19, 2002 through August 29, 2003, defendants'

Mahaffey, Chen and Roudi knowingly and willfully employed a series of delay tactics

against Affiant Denise McRae to purchase the1812 North Capitol St. property as

follows: (1) after Mahaffey executed the Roudi/Chen contract on September 19, 2002,

the tenants did not receive the required ten (10) notice until November 3, 2002, forty-

five (45) days after the contract was executed; (2) from December 15, 2002 to April 17,

2003, Mahaffey ignored the tenants notice of intent to purchase their building.

141.    From April 28, 2003 through April 2004, Mahaffey, Roudi and Chen

knowingly and repeatedly conspired and did so obstruct and delay the tenants Right

to purchase by; (1) refusing to execute the tenant contract until August 29, 2003, using

false excuses by Mahaffey in seeking legal advice when she in fact is a licensed lawyer

in the District; at multiple other times Mahaffey used her legal acumen to discourage

and defeat the execution of the contract; (2) from January 2003 through January 2004,

Mahaffey foiled the tenants purchase by refusing to renovate the three (25%) vacant

units, making it impossible to obtain the purchase financing to buy their building.

142.    From December 2002 though May 2003, defendants Mahaffey and Roudi

through their outrageous and illegal behavior, knowingly and willfully forced

African-American Nattonnia Ross and her family from their home through

intimidation and raced-based actions to the severe detriment of the family.

143.    Defendants and each of them conspired in their actions at the Brooks St.

property because (1) they did not want Affiant Nattonnia Ross, the female African-

American family to purchase her home and, (2) because they couldn't sell the home

while Affiant Nattonnia Ross and her family lived their under a valid lease.

144.    Defendants Mahaffey, Chao Chen, Shahram Roudi and Mead conspired to and did so conspire by engaging in acts of discrimination for the purpose of depriving Affiants' Denise McRae and her family, the African-American tenants and their families at 1812 North Capitol St., and Nattonnia Ross and her family of the equal protection of laws, and Affiants Denise McRae and Nattonnia Ross and their families were injured by acts done in furtherance of the conspiracy and fraud and the attainment of each of the defendants' ultimate goals.

**WHEREFORE:** Plaintiff demands judgment against defendants' Mahaffey, Shahram Roudi, Chao Chen and Mead in connection with this Count in the amount of $2,000,000 each for compensatory damages and $150,000 each for punitive damages, together with reasonable attorneys' fees, costs, and such other relief as this Court deems proper.

### COUNT FIVE

### VIOLATIONS OF THE FEDERAL FAIR HOUSING ACT OF 1968 AS AMENDED AND DECLARATORY RELIEF

145.    Plaintiff repeats and realleges each allegation contained in this complaint as if specifically set forth herein.

146.    Based on a November 9, 2004  Order in the United States Bankruptcy Court, #02-12644, the Honorable Judge Mannis' Denied the sale of the 8204 Moorland Lane, Bethesda, Md. home to defendants "Royal Investment Group, LLC"/ Kathy Tiong, subject to defendant Mahaffey filing an underlying Adversary Proceeding.

147.    Defendants' failure to act from October 15, 2004 hearing through June 22, 2005 by filing the Adversary Proceeding in accordance with the November 9, 2004 constitutes an acknowledgement by defendants' Mahaffey, Mead, "Royal Investment

Group, LLC" and Kathy Tiong that their contract for $745,000 was fraudulent in the execution and inferior in value to plaintiffs' $761,000 unconditional financing contract.

148.    Plaintiff filed the underlying Adversary Proceeding case # 05-01314 on June 22, 2005 to bring the fraudulent defendants' contract from darkness into light and the scrutiny of the United States Bankruptcy Court, after defendants for six (6) months failed to do the same in accordance with the November 9, 2004 Order.

149.    Defendant Meads' calculated dismissal of her Chapter 11 case in the United States Bankruptcy Court,  #02-12644 on July 12, 2005, which in turn caused the plaintiffs underlying Adversary Proceeding to be moot, is further evidence of co-defendants' concerted actions and contrivances to prevent a just and fair sale of the 8204 Moorland Lane home to the plaintiff.

150.    A case of actual controversy exists between the parties pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. Sections 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure, and that absent a Declaratory Judgment from this Court, plaintiff will continue to be adversely affected by co-defendants actions.

**WHEREFORE:** plaintiff prays that this Court enter a Declaratory Judgment providing for the following relief:

(1)    Based on Count I, Order and Declare Null and Void the fraudulently induced and executed contract among defendants' Mahaffey, "Royal Investment Group, LLC" and Kathy Tiong based on Counts One and Two and on the facts submitted in this Complaint;

(2)    Based on Count I, Order and Uphold Judge Mannis' November 9, 2004

Order in the U.S. Bankruptcy Court denying the $745,000 sale of the 8204 Moorland Lane, Bethesda, Md. home to defendants "Royal Investment Group, LLC" and Kathy Tiong based on Counts One and Two and on the facts submitted in this Complaint;

(3)    Based on Count V, Order and Declare plaintiffs' $761,000 offer dated August 27, 2004 the highest and best lawful offer for the purchase of the 8204 Moorland Lane, Bethesda, Md. home in accordance with the October 15, 2004 hearing in the U.S. Bankruptcy Court and Judge Mannis' November 9, 2004 Order in the U.S. Bankruptcy Court based on Counts One and Two and on the facts submitted in this Complaint;

(4)    Based on Count V, Order that the proceeds of sale of 8204 Moorland Lane, Bethesda, Md. home to plaintiff be applied to the residual assets of the jointly-held marital properties and that the escrow account maintained by Mahaffey proceed to the Circuit Court appointed auditor to divide the jointly-held assets equally in accordance with Circuit Court Order dated march 7, 2002;

(5)    Grant such other and further relief as may be just and proper.

**WHEREFORE:** Plaintiff demands judgment against defendants' Mahaffey, Shahram Roudi, Chao Chen, Kathleen Sheeran, Weichert Realtors, "Royal Investment Group, LLC" Michael Jagoda/Parcorp Services Ltd, Nasser Shahparast, Timothy Crowley of Remax Realtors, Kathy Tiong and Yona Mead in connection with this Count in the amount of $2,000,000 each for compensatory damages and $150,000 each for punitive damages, together with reasonable attorneys fees, costs, and such other relief as this Court deems proper.

## JURY DEMAND

Plaintiffs demand trial by jury on all counts and on all issues in this Complaint.

Respectfully submitted,

David Mead, Pro Se
8204 Moorland Lane
Bethesda, Maryland, 20817


Jenise McRae
1814 North Capitol Street, N.W. #3
Washington, D.C. 20001

# EXHIBIT A

Index No. 2028-02

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF QUEENS

In the Matter of the Application of PROMENADE NURSING
HOME for the Appointment of a Guardian of

LENI BENJAMIN,

An Alleged Incapacitated Person.

## ORDER TO SHOW CAUSE AND SUPPORTING PAPERS

Section 130-1.1 Signature:

Alan Marcus for Allen Federman

**ALLEN FEDERMAN**
Attorney for Original Petitioner
118-21 Queens Boulevard
Forest Hills, N.Y. 11375
(718) 268-3900

Sirs: Please take notice that a Judgment of which the within is a true copy will be presented for settlement
to the Justice Presiding at an I.A.S Part 20 of the within named Court, at 88-11 Sutphin Boulevard, Jamaica, New York
on the     th day of        , 2002 at       M.

Dated:

Yours, etc.

Allen Federman
Attorney for Petitioner

Office and P.O. Address
118-21 Queens Boulevard
Forest Hills, New York 11375

(718) 268-3900

Case 1:04-cv-08516-EGF   Document 16-2   Filed 04/21/2006   Page 38 of 62

## "A-1"

At an I A S Part 20 of the Supreme Court of the
State of New York, held in and for the County of
Queens, at the Courthouse, 88-11 Sutphin
Boulevard, Jamaica, New York, on the 19 ,
day of April , 2002.

PRESENT:

HON.   JANICE A. TAYLOR ,

Justice.

————————————————————————— X

In the Matter of the Application of PROMENADE NURSING
HOME for the Appointment of a Guardian of

LENI BENJAMIN,

ORDER TO
SHOW CAUSE

Index No. 2028-02

An Incapacitated Person.

————————————————————————— X

Upon reading the annexed Affirmation of ALAN MARCUS, ESQ., dated

the 15th day of April, 2002, and upon all prior papers and proceedings herein, from which it appears

that LENI BENJAMIN, the incapacitated person, requires the appointment of a Temporary Guardian

forthwith to function while the application for a permanent Guardian is pending;

LET LENI BENJAMIN, YONA MEAD, the siblings of LENI BENJAMIN, if any,

Director of Mental Hygiene Legal Service, HELEN COOPER GREGORY, ESQ., and the

1

Temporary Guardian appointed herein show cause at a hearing to be conducted before this Court on the 29th day of May, 2002 at 9:30 of that day, or as soon thereafter as counsel can be heard why an Order should not be made and entered herein providing for a final disposition as to the Temporary Guardian appointed herein;

SUFFICIENT reason appearing therefore, it is

ORDERED, that BARBARA J. BERLOWITZ Esq of 118-21 Queens Blvd, Forest Hills, NY 11375-7201 (718) 544-7200 be and hereby is appointed Temporary Guardian of LENI BENJAMIN, the alleged incapacitated person, and shall have the following Temporary Powers:

To immediately pursue recovery of LENI BENJAMIN's assets that were withdrawn from her accounts by YONA MEAD or any other party including but not limited to asserting a claim with the Trustee in the Bankruptcy Court Matter of YONA MEAD, and it is further

ORDERED, that the filing of a bond by the temporary guardian is waived, and it is further

ORDERED, that this Order shall be deemed the Commission of the Temporary Guardian, and it is further

ORDERED, that this Order to Show Cause and supporting papers shall be served upon LENI BENJAMIN, the alleged incapacitated person, by delivering them to LENI BENJAMIN

2

# EXHIBIT B

**BARBARA J. BERWITZ**
**ATTORNEY AT LAW**
**118-21 Queens Boulevard**
**Forest Hills, N.Y. 11375**
**(718) 544-7200**
**Fax No. (718) 544-7921**

July 15, 2002

United States Bankruptcy Court
District of Maryland
Greenbelt Division
6500 Cherrywood Lane
Suite 300
Greenbelt, MD 20770

Re: Yona Mead
Case No. 02-12644

Gentlemen:

Please be advised that I was appointed temporary guardian for
Leni Benjamin who is an aunt of the above debtor. A copy of the
order appointing me is submitted herewith.

According to the information that we have received from family
members of Leni Benjamin, Yona Mead obtained a power of attorney
from Leni Benjamin. It is questionable if this was lawfully
obtained. The power of attorney was used to close out accounts
belonging to Leni Benjamin. Although we do not have information
regarding the exact dates and the amounts the estimate that we
have is that at least $300,000.00 must be returned to Leni
Benjamin.

I believe that this constitutes a priority claim in view of the
fact that, if our information is correct the funds that are in
the possession of Yona Mead are funds which rightfully belonged
to Leni Benjamin and were wrongfully appropriated by Yona Mead.
Our investigation is continuing and we will need time to
ascertain when various accounts, from which funds were taken and
where the assets were transferred.

If you need any further information, please feel free to contact
me.

Very truly yours,

Barbara J. Berwitz

BJB:vm

**"B-1"**    7/12/02

FORM B10 (Official Form 10) (4/01)

| UNITED STATES BANKRUPTCY COURT | DISTRICT OF MARYLAND | PROOF OF CLAIM |
|---|---|---|

| Name of Debtor: YONA MEAD | Case Number: 02-1264E | |

NOTE: This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A "request" for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.

Name of Creditor: (The person or other entity to whom the debtor owes money or property):
LENI BENJAMIN by BARBARA J. BERWITZ Guardian

Name and address where notices should be sent:
BARBARA J. BERWITZ, ESQ
118-21 Queens Boulevard
Forest Hills NY 11375
Telephone number: 718-544-7200

☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.

☒ Check box if you have never received any notices from the bankruptcy court in this case.

☐ Check box if the address differs from the address on the envelope sent to you by the court.

2002

**THIS SPACE IS FOR COURT USE ONLY**

Account or other number by which creditor identifies debtor:

Check here if this claim ☐ replaces ☐ amends a previously filed claim, dated:

**1. Basis for Claim**
- ☐ Goods sold
- ☐ Services performed
- ☐ Money loaned
- ☐ Personal injury/wrongful death
- ☐ Taxes
- ☒ Other Money withdrawn wrongfully from bank account of LB

- ☐ Retiree benefits as defined in 11 U.S.C. § 1114(a)
- ☐ Wages, salaries, and compensation (fill out below)
  Your SS # _____
  Unpaid compensation for services performed
  from _____ to _____ (date) (date)

**2. Date debt was incurred:** LENI BENJAMIN various acct

**3. If court judgment, date obtained:**

**4. Total Amount of Claim at Time Case Filed:** $ 400,000.00

☐ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of all interest or additional charges.

**5. Secured Claim.**
☐ Check this box if your claim is secured by collateral (including a right of setoff).

Brief Description of Collateral:
☐ Real Estate    ☐ Motor Vehicle
☐ Other

Value of Collateral: $_____

Amount of arrearage and other charges at time case filed included in secured claim, if any: $_____

**6. Unsecured Priority Claim.**
☐ Check this box if you have an unsecured priority claim
Amount entitled to priority $_____
Specify the priority of the claim:
- ☐ Wages, salaries, or commissions (up to $4,650),* earned within 90 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier - 11 U.S.C. § 507(a)(3).
- ☐ Contributions to an employee benefit plan - 11 U.S.C. § 507(a)(4).
- ☐ Up to $2,100* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use - 11 U.S.C. § 507(a)(6).
- ☐ Alimony, maintenance, or support owed to a spouse, former spouse, or child - 11 U.S.C. § 507(a)(7).
- ☐ Taxes or penalties owed to governmental units - 11 U.S.C. § 507(a)(8).
- ☒ Other - Specify applicable paragraph of 11 U.S.C. § 507(a)(___).
*Amounts are subject to adjustment on 4/1/04 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.

**7. Credits:** The amount of all payments on this claim has been credited and deducted for the purpose of making this proof of claim.

**8. Supporting Documents:** *Attach copies of supporting documents,* such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, court judgments, mortgages, security agreements, and evidence of perfection of lien. DO NOT SEND ORIGINAL DOCUMENTS. If the documents are not available, explain. If the documents are voluminous, attach a summary.

**9. Date-Stamped Copy:** To receive an acknowledgment of the filing of your claim, enclose a stamped, self-addressed envelope and copy of this proof of claim.

**THIS SPACE IS FOR COURT USE ONLY**

Date: 7/12/02

Sign and print the name and title, if any, of the creditor or other person authorized to file this claim (attach copy of power of attorney, if any):
Barbara J. Berwitz    Leni Benjamin Guardian

Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.



Independence Community Bank
Cashier's Check
Customer Copy

3869931

To The
Order Of          *** YONA MEAD ***

SEQUENCE #     0040          TIN #   00829

****One Hundred Twenty-Two Thousand Three Hundred One and 51/100 Dollars**************

Check No.   5006123987

Date   03/01/2000

Amount   $122,301.51

NON-NEGOTIABLE

## Independence
Community Bank

CASHIER CHECK

Pay To The
Order Of       *** YONA MEAD ***

****One Hundred Twenty-Two Thousand Three Hundred One and 51/100 Dollars******

The Cashier's check Must be Presented Within Six Months • Void if Altered

1-2/210

5006123987

Date   03/01/2000

Memo
CHASE
55 WATER STREET
NEW YORK, NY 10041

Two Signatures Required for
Amounts $10,000 and Up

$**122,301.51**

"B-2"

# EXHIBIT C

# (see original complaint)

# EXHIBIT D

# AFFIDAVIT OF DENISE MCRAE

**The following statement of facts are made of my own free will, with the sole intention to speak the truth and with no pressure or incentive to state the facts otherwise.**

I, Denise McRae, being first duly sworn upon oath, depose and state as follows:

1.    I am over eighteen years of age, have personal knowledge of the facts contained herein, and am competent to testify.

2.    I am a tenant of a property located at 1812-14 North Capitol Street, N.W., Apt. # 3, Washington, D.C. 20002.

3.    In mid-September 2002, Mr. Shahram Roudi arrived at our building and announced that he represented the "new owners" of the building. His unexpected visit and his loud and aggressive manner caused fear and apprehension for myself and other residents of the building.

4.    From mid-September through mid-November, Mr. Roudi and his associates made several visits to the property, knocking on tenant doors during all times of the day and night, without any prior notice, demanding entry into our apartments to "inspect the premises". He always did this in a very intimidating manner.

5.    On one occasion, I told Mr. Roudi that we as tenants intended to exercise our right to purchase the building. He responded: "You have an awful lot to say Ms. McRae". "Maybe if you don't like living here you can leave". He talked as though I was inferior to him. It was insulting and deaming to me.

6.    On another occasion in late-September 2002, one of Mr. Roudis' associates stood outside the building and told several of us that the "new owners" intended to pay tenants $3,000-$5,000 apiece to move out so they could rehabilitate the building and re-sell the units as condominiums to middle-income residents ($125,000 - $150,00).

7.    On two separate occasions, we heard Mr. Roudi telling his associates to "jack up" the price of their bid proposals. The first time was in late-September, 2002 with a consulting engineer. Mr. Roudi told the engineer to inflate the cost estimate to so he could "cram down" the purchase price for the "new owners". Apparently, the "new owners" made an offer higher than what they were willing to pay.

8.    On the second occasion in early October, 2002, we heard Mr. Roudi tell another contractor, Master Builder Inspection, Inc. to inflate the price so that the Trustee selling the building could withdraw money from an escrow account to make improvements to the property prior to settlement.  I understand the estimate was for $35,000.   By comparison , the lowest bid from Bey's Home Improvements was for $2,800.  The work was completed by the second highest bid  was $6,000, one-sixth of the inflated price.

9.    Whenever we talked to Mr. Roudi of our intention to purchase the building, he invoked his close relationship with the Trustee, Ms. S.A. Mahaffey and said it wouldn't happen.  They did this to discourage us and to delay our purchase of the building.

10.    Since that time we have duly organized as a tenant association,  Affordable Housing Choices, LLC and expect a fully ratified contract from the Trustee, S.A. Mahaffey in the next few days, despite Mr. Roudis' intimidating tactics.

11.    We believe Mr. Roudis motive all along was to simply to get his 5% commission, however, both Mr. Roudi  and the Trustee, S.A. Mahaffey's attitude and actions always seemed to have racial overtones as well.

12.    Since the Trustee S.A. Mahaffey took control of our building in April 2002, maintenance ceased except for government imposed infractions, and conditions have become indecent, unsafe and unsanitary.  It is demeaning to live in these conditions.

12.    We understand from talking with officials at the Department of Housing and Community Development and Consumer and Regulatory Affairs that several violations of law have occurred by Mr. Roudis' actions, specifically frequent and unannounced visits over a two month period of time beyond any reasonable inspection period.

13.  I have re-read the attached documents dated 12/27/02, 4/9/03 and 6/2/03. and they are absolutely truthful representations (see attached).

I DO SOLEMNLY DECLARE AND AFFIRM UNDER THE PENALTIES OF PERJURY THE CONTENTS OF THE FOREGOING DOCUMENT AND ATTACHMENTS ARE CORRECT AND TRUE AND BASED UPON PERSONAL KNOWLEDGE.

_Denise McRae_

Denise McRae, President
Affordable Housing Choices, LLC.

Subscribed and sworn to me this _21st_ day of _August_, 2003

_Notary Public_
My commission expires 09-14-07

# EXHIBIT E

# AFFIDAVIT OF NATTONNIA ROSS

**The following statement of facts are made of my own free will, with the sole intention to speak the truth, and with no pressure or incentive to state the facts otherwise.**

I, Nattonnia Ross, do hereby state the following:

## SPECIFIC FACTS:

I am an African-American woman and mother of six children whose ages are 15, 10, 9, 5 and two 3-year-old twins.

I moved into 5004 Brooks St., N.E., Washington, D.C. on June 1, 2001.

The lease term at 5004 Brooks Street, N.E., was in effect through June 2003. I had planned to renew the lease with the longer term objective of buying the house through the District of Columbia housing assistance programs.

On about the middle of November 2002, Mr. Ron Roudi, also known as Shahram Roudi, unexpectedly came to my home. He advised me that he was hired by Ms. Sue Mahaffey, Trustee, to sell the house. I told him to talk to David Mead, the man who owned and rented me the house. He said he didn't have to talk to anyone and that David Mead was no longer the owner.

On about the end of November 2002, Mr. Roudi came to my home again and installed a "For Sale" sign in the front yard. He asked to make my home available to show to potential buyers. I agreed to do that as long as he called my mother to give  24 hours advance notice.  He agreed to do that.

A few days later, Mr. Roudi called my mother as agreed and brought a white male by my home the following day. This was the first and <u>only</u> time he gave advance notice. He came <u>7 other times</u> after that **without giving any advance notice whatsoever.**

On two separate occasions, he came to my home when my sister Georgia was baby-sitting my children. The first time he came alone and said that he was there " just checking things out". Georgia refused to let him in the house

because I was not at home and she was not expecting him. Mr. Roudi became very angry and had heated words with Georgia as a result.

Around the Christmas/New Year's holidays, Mr. Roudi showed up twice more with a 28-30 year old white female who he described as the "new owners". I was told they had bought the house and were going to do major renovations while my family still lived there. This troubled me a lot. The second time they came by, they said they couldn't do the renovations while we lived there so we'd have to move out before the renovations got started. Mr. Roudi pressured me to find another place to stay during the renovations. I was feeling a lot of anxiety and fear. I had no place for my family to go.

Around the early part of January 2003, Mr. Roudi came by again with "First Right of Refusal" papers. He asked me if I was interested in buying the house. I told him I wanted to buy it but didn't have the money at the time. Then he said I couldn't afford to buy it and asked me to sign the papers so he could turn them into the Section 8 office. I didn't know what to do. I felt a lot of pressure and was upset about the whole matter. Eventually, I signed the papers.

A few days later, Mr. Roudi came by again with another white male. By this time, I was completely frightened and refused to let him in. He started pounding very hard on the front door and was shouting, demanding that I open the door. He was there for about 20 to 30 minutes, walking around the outside of the house, banging on the front and back doors and shouting. He tried to get in from the side and cellar entrances but the doors were locked.

The second time he came when my sister Georgia was baby sitting, she was in the bathroom upstairs when Mr. Roudi arrived with a white male. The children opened the door for them. They walked in and went through the entire house. They went upstairs and walked into the bathroom while Georgia was unclothed and getting out of the bathtub. This was extremely distressing to her. Mr. Roudi and the white male acted undeterred. He said that he had received a down payment and that the house had been sold. He told my sister that we didn't belong there anymore and had to move. He also said the utilities were going to get cut off. Terribly frightened of that prospect, we called and left two or three messages to Ms. Mahaffey but she didn't return the calls.

All this experience left me very frightened for my family. Mr. Roudi deliberately misled us into believing that the house was sold and we had to move out, even though the lease term was effective to June 2003. Under a lot of pressure and afraid for the well-being of my children, I moved out in haste on January 25, 2003, leaving many of my personal belongs behind, including my daughters bed and children's' clothing. Before moving, I told Mr. Roudi I had no money to move. He told me to call Ms. Mahaffey and get some money from her.

Throughout this whole ordeal, both my mother and I left messages with Ms. Mahaffey but she never returned the calls.

A few days after I moved out, I returned to get more of my belongings. I noticed that the back door had been kicked in. Also, the new washer and dryer were no longer in the basement. I called Mr. Roudi around January 27 and asked if he had been to the house. He sounded suspicious and kept asking, "why do you want to know"? When I told him that the washer and dryer were missing, that's when he said he had not been to the house.

One of the main reasons that I leased this house from Mr. Mead was that he promised to assist me in buying the house through government sponsored home-ownership programs. I was very excited about that possibility. Now the house is boarded up and my home ownership opportunity has evaporated. This should never have happened under any circumstance.

All the time that I knew Mr. Roudi, I found him to be a very intimidating person. He is also dishonest. He stated that the house was "sold" when it was not. **He used unscrupulous tactics and threatened my family that caused me to move out *five months before my lease expired*** under extreme circumstances. Apparently, he did this so he could earn a real estate commission that he would have otherwise not earned had I stayed and purchased the house as originally intended. I believe Mr. Roudi should be punished for his unscrupulous actions and for the pain and humiliation that he has caused for my family and me.

Nattonnia Ross

Subscribed and sworn to me this __11th__ day of __June__, 2003

JESSICA MARIA RODRIGUEZ
Notary Public, State of Maryland
My Commission Expires Aug. 23, 2005

Notary Public

# EXHIBIT F

## IN THE CIRCUIT COURT FOR MONTGOMERY COUNTY MARYLAND

YONA MEAD                                    :
                                             :
                                             :
                                             :
            Plaintiff                        :
                                             :           Case No: 13261 FL
     v.                                      :
                                             :
DAVID MEAD                                   :
                                             :
                                             :
            Defendant                        :

## AFFIDAVIT OF JASMIN B. SALLOUM, Ph.D.

I, Jasmin B. Salloum, hereby do depose and swear as follows:

1.      I am over 18 years old and am competent to testify to the facts stated herein.

2.      I have no relationship with Mr. David Mead, his daughter Rebecca Mead, or any other party in interest.

3.      I came to the United States from Germany in October 2001 as a Postdoctoral Research Fellow to do neuroscience research at the National Institutes of Health (NIH).

4.      At the time of my arrival in the United States, I leased a studio and bedroom in Mr. Mead's house, 8204 Moorland Lane, so that I could live close to my work at NIH.

5.      During the time I resided at the above address, my contact with Mr. Mead and his daughter was minimal. I had a separate entrance to the home and I devoted much of my spare time to furthering my career at NIH.

6.      On or about May 2004, I was advised by Mr. Mead that the property was going to be marketed for sale and that an "open house" would be conducted to establish a market value for the home. I was also advised by Mr. Mead that marketing the house

would require complete cooperation on my part as well as on the part of Mr. Mead and his daughter, Rebecca. I was very agreeable to that process.

7.    During the time leading up to the "open house," Mr. Mead showed the home, including my leased premises, to several prospective purchasers and inspectors. I am aware that he did this, in part, to be respectful of my wishes not to allow random access to my leased space to unknown persons.

8.    During the time leading up to and including the "open house," to my knowledge, Mr. Mead did not do anything that I know of to discourage prospective purchasers. Rather, Mr. Mead emphasized to me several times the importance of cooperation with the process and that he would benefit from a higher price of the home.

9.    I was present on the day of the "open house." At that time, the home contained several family pets before and at the time of the "open house." The rabbits were properly housed in suitable cages and maintained by Rebecca Mead. Ms. Mead worked after high school cleaning animal cages at a Veterinarian Hospital in Bethesda, so I believe she knew about care and maintenance of the animals. I did not notice any unpleasant odors or atmosphere during the "open house."

10.    I own two pet ferrets that were present in my leased space. They were well-maintained and properly controlled. During the "open house" one remained completely out of sight and the other was never loose or uncontrolled. I do not believe that they caused an adverse showing of the home. It is my understanding, from Mr. Mead, that during an appraisal of the home, Ms. Kathleen Sheeran refused to go into

my leased premises because she expressed a phobia of my pets. I also know that Ms. Sheeran never once entered my leased space during the "open house."

11.    On the day of the "open house" the home was not "staged to look as bad as possible". The home was in a normal, lived-in condition. I also made certain that my premises was in a clean and orderly condition. All surfaces were not cluttered and covered and items had not been "dumped on the floor." There were pets present of course, but in a family-friendly environment.

12.    Whenever there were visitors present to see my leased portion of the home, Mr. Mead politely knocked on my door to allow the visitors to enter. He did not escort visitors through my leased premises as stated.

13.    I do not know of nor did I observe any "antics" by Mr. Mead before, during or after the "open house." On the contrary, he appeared to act entirely normal and what I know and observed is that Mr. Mead was courteous and helpful at all times.

**I DO SOLEMNLY DECLARE AND AFFIRM UNDER THE PENALTY OF PERJURY AND UPON PERSONAL KNOWLEDGE THAT THE FOREGOING IS TRUE AND CORRECT.**

Jasmin B. Salloum

# EXHIBIT G

# (see original complaint)

# EXHIBIT H

**SO ORDERED**

**Date signed November 09, 2004**



**PAUL MANNES**
U. S. BANKRUPTCY JUDGE

### UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF MARYLAND
### at Greenbelt

IN RE:                                          :

YONA MEAD                                 :        Case No. 02-12644PM
                                                      :        Chapter 11
                          Debtor             :
- - - - - - - - - - - - - - - - - - - - - - - - - -:

### ORDER DENYING MOTION
### FOR AUTHORITY TO SELL REAL PROPERTY

Upon consideration of the Debtor-in-Possession's Motion for Authority to Sell Real Property and the record herein, and it appearing to the court that the proposed sale can only be imposed upon the co-owner by means of an order entered in an adversary proceeding pursuant to 11 U.S.C. § 363(h), it is, by the United States Bankruptcy Court for the District of Maryland,

ORDERED That the Motion is denied without prejudice to the filing of an adversary proceeding that may be processed on an expedited basis.

cc:
Jonathan P. Morgan, Esq., 50 West Edmonston Drive, Suite 600, Rockville, MD 20852
Stephen A. Metz, Esq., Shulman Rogers, 11921 Rockville Pike, Rockville, MD 20852
Yona Mead, 5176 Linnean Terrace, N.W., Washington, DC 20008
David Mead, 8204 Moorland Lane, Bethesda, MD 20817
Brian Barkley, Esq., 51 Monroe Street, Rockville, MD 20850
United States Trustee, 6305 Ivy Lane, #600, Greenbelt  MD  20770

### End of Order

049025

# EXHIBIT I

Entered: July 12, 2005
Signed: July 11, 2005

**SO ORDERED**



PAUL MANNES
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND

IN RE:                                    *

       YONA MEAD                      *      Case No. 02-12644

                                     Chapter 11

   Debtor-in-Possession               *

 *    *    *    *    *    *    *    *    *    *    *    *

### ORDER DISMISSING CHAPTER 11 CASE
### ON MOTION OF DEBTOR-IN-POSSESSION

The Debtor-in-Possession having moved for dismissal of her Chapter 11 case, and the

Court finding that notice was proper, and there being no objections to the relief requested, it is,

by the United States Bankruptcy Court for the District of Maryland,

**ORDERED**, that the above-referenced Chapter 11 case is dismissed; and it is further,

**ORDERED**, that the automatic stay imposed by 11 U.S.C. Section 362 is terminated and

all creditors and parties in interest are so advised.

cc:    Jonathan P. Morgan               Office of U.S. Trustee
       50 W. Edmonston Dr., Ste. 600     6305 Ivy Lane, Ste. 600
       Rockville, MD 20852            Greenbelt, MD 20700

       Yona Mead                       Sue Ann Mahaffey
       P.O. Box 30435                 25 W. Middle Ln.
       Bethesda, MD 20824            Rockville, MD 20850

### End of Order

043285

# EXHIBIT J

Signed: July 12, 2005

**SO ORDERED**



PAUL MANNES
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Greenbelt

| | |
|---|---|
| In re: | Case No.  02–12644 – PM |
| **Yona Mead**<br>**Debtor(s)** | Chapter  11 |
| **Plaintiff(s)**<br>**David Mead** | Adversary No.  05–01314 |

vs.

**Defendant(s)**
**Sue Ann Mahaffey**

**Michael J. Jagoda**
**Kathleen Sheeran**
**Kathleen Tiong**
**Foreclosure Real Estate**
**Services**

## ORDER DISMISSING COMPLAINT AS MOOT
## (AFTER DISMISSAL OF CASE)

It appears that Debtor(s)' case under the Bankruptcy Code was dismissed on July 12, 2005 . Because of the dismissal of the case, there is no continuing jurisdiction to try the above–captioned complaint. It is, therefore, by the United States Bankruptcy Court for the District of Maryland,

ORDERED, that the complaint herein is dismissed, without prejudice, as moot.

cc:   Plaintiff(s)
      Attorney for Plaintiff(s) – PRO SE
      Defendant(s)
      Attorney for Defendant(s) – ATTORNEY NOT ENTERED FOR THE FIRST DEFENDANT
      Trustee

**19.4 – lalexander**

030118